## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x

In re:                                              :    Chapter 11
                                                    :
THQ INC., *et al.*,                                 :    Case No. 12-13398 (MFW)
                                                    :
     Debtors.[1]                             :    Jointly Administered
                                                    :
                                                    :    **Proposed Objection Deadline: At the Hearing**
                                                    :    **Proposed Hearing Date: February 19, 2013 at 9:30 a.m. (ET)**
                                                    :

-----------------------------------------------------------x

### DEBTORS' MOTION PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004, 6006 AND 9019, FOR AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO AGREEMENTS WITH TAKE-TWO INTERACTIVE SOFTWARE, INC., WORLD WRESTLING ENTERTAINMENT, INC. AND YUKE'S CO., LTD.

THQ Inc. ("**THQI**") and its affiliated debtors in the above-captioned chapter 11

cases, as debtors and debtors in possession (collectively, the "**Debtors**"), hereby move this Court

(the "**Motion**") for entry of an order, substantially in the form annexed hereto as **Exhibit A**,

authorizing and approving transactions by and among THQI, Take-Two Interactive Software,

Inc. ("**Take-Two**"), World Wrestling Entertainment, Inc. ("**WWE**") and Yuke's Co., Ltd.

("**Yuke's**") to eliminate the large claims that might otherwise arise from the termination of

THQI's contracts with WWE and Yuke's and transitioning the development of future "WWE

Games", as defined below.  In support of this Motion, the Debtors respectfully state as follows:

### JURISDICTION

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334, and the *Amended Standing Order of Reference from the United States District Court*

---

[1]  The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  THQ Inc. (1686); THQ Digital Studios Phoenix, Inc. (1056); THQ Wireless Inc. (7991); Volition, Inc. (4944); and Vigil Games (8651). The Debtors' principal offices are located at 29903 Agoura Road, Agoura Hills, CA 91301.

*for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363(a) and 365(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 6004, 6006 and 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). The Debtors have been informed that the Official Committee of Unsecured Creditors (the "**Committee**") supports the Motion.

## BACKGROUND

3.      On December 19, 2012 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

4.      The Debtors' chapter 11 cases (the "**Chapter 11 Cases**") are consolidated for procedural purposes only and are jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Local Rules.  No trustee or examiner has been appointed in the Chapter 11 Cases.

5.      On January 3, 2013, the United States Trustee for the District of Delaware appointed the Committee [D.I. 80].

6.      Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases can be found in the *Declaration of Brian Farrell in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* filed on the

2

Petition Date [D.I. 2].

## The Prepetition Agreements with WWE and Yuke's

7.      THQI and WWE entered into that certain License Agreement dated
December 22, 2009 (as amended, the "**WWE License**") pursuant to which THQI agreed to
develop interactive entertainment software games (the "**WWE Games**") based on certain of
WWE's intellectual property (the "**WWE IP**").  Pursuant to the WWE License, THQI has the
exclusive right to develop WWE Games based on the WWE IP through 2017.

8.      Pursuant to the WWE License, THQI is obligated to pay WWE an
advance of $7.5 million each year through 2017.  Each advance is recoupable each year against
royalties earned during that calendar year.  Based on the sales of WWE 2013, as of the Petition
Date THQI owed WWE approximately $7.6 million for royalties and marketing expenses (after
recoupment of the $7.5 million advance) .

9.      THQI employed approximately twenty (20) employees (the "**THQ Fight
Team**") to develop and market the WWE Games.  THQI owns the equipment used by the THQ
Fight Team.  THQI estimates that the liquidation value of this equipment is no more than
$75,000.

10.      THQI also contracted with a third-party developer, Yuke's, to develop the
WWE Games pursuant to that certain Master Developer Agreement between THQI and Yuke's
dated July 2, 2011 (as amended, the **"Yuke's Master Developer Agreement"**).  As of the
Petition Date, pursuant to the Yuke's Master Developer Agreement THQI owes Yuke's
approximately $15 million to $20 million for services developing the WWE Game released in
October 2012 ("**WWE 2013**") and the WWE Game being developed for release in October 2013
("**WWE 2014**").  In addition to paying development fees, THQI might also become liable to

Yuke's for royalties based on sales, if the sales volume is high enough to fully recoup all development costs.

11.    THQI owns 1,552,000 shares of Yuke's (the "**Yuke's Equity**"), which is approximately 14% of the total outstanding shares in Yuke's. Yuke's stock is publicly traded, but the volume of trading is such that it would likely not be practical for THQI to liquidate this stock through public sales in the next several months without depressing the market value of that stock. The trading price for the Yuke's stock has a current share price of $2.89 and a weighted average price of $3.17 over the past thirty (3) days. At $2.89 per share the 1,552,000 shares owned by THQI would have an aggregate value of $4.485 million, but it is unlikely that THQI could sell its stock for $2.89 per share because of the large number of shares held. Yuke's would like to acquire this stock.

B.    **Sale of a Substantial Portion of the Debtors' Operating Assets.**

12.    On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of (I) an Order Authorizing and Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Authorizing and Approving Stalking Horse Protections, (C) Authorizing and Approving Procedures Related to the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale, (D) Scheduling Auction and Sale Approval Hearing, (E) Approving the Form and Manner of the Notice of the Sale Hearing, and (F) Granting Certain Related Relief, and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale, and (C) Granting Certain Related Relief* [D.I. 19] (the "**Sale Motion**"), which sought authority from the Court to conduct an auction of substantially all of the Debtors' assets (the "**Auction**").

13.     On January 11, 2013, the Court entered the *Corrected Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of the Operating Assets of the Debtors, (B) Stalking Horse Bid Protections, (C) Form and Manner of Notice of the Sale Hearing and (d) Related Relief* [D.I. 152] (the "**Bid Procedures Order**"). Pursuant to the Bid Procedures Order, the Auction was scheduled to commence on January 22, 2013.

14.     The stalking horse bidder's bid for the Debtors' assets did not include THQI's rights to develop the WWE Games pursuant to the WWE License or THQI's rights under the Yuke's Master Developer Agreement (the "**WWE Assets**").

15.     On January 22 and 23, 2013, the Auction was held by the Debtors. The Auction resulted in sales of substantially all of the Debtors' operating assets to five separate bidders (the "**Successful Bidders**") who submitted piecemeal bids for certain assets of the Debtors. The Court entered Orders approving the sales to the Successful Bidders on January 24, 2013. None of the bidders at the Auction bid for the WWE Assets.

16.     THQI and Centerview Partners LLC ("**Centerview**"), the Debtors' investment banker, solicited independent interest in the WWE Assets before the Petition Date. No party indicated a willingness to assume the Debtors' obligations under the WWE Agreement and/or the Yuke's Master Developer Agreement. Every potential buyer appears to have concluded that the obligations under those agreements exceed the benefits thereunder. Therefore, the WWE License and the Yuke's Master Developer Agreement appear to create a net liability for the Debtors' estates, not a saleable asset.

17.     If the WWE License were simply terminated and no WWE 2014 game were produced WWE would assert large claims against THQI. As of the Petition Date, THQI owed WWE approximately $7.6 million in royalties for sales of the WWE Games and marketing

expense reimbursements. WWE would likely assert damage claims for failure of THQI to pay the minimum annual royalty of $7.5 million each year in the future. The minimum future royalty payment plus the amount due for WWE 2013, combined, could total approximately $45 million in damages. While THQI would contend that WWE could and should mitigate its damages by contracting with another publisher to develop future WWE Games, the unwillingness of any publisher to assume THQI's obligations under the WWE License is an indication that WWE might not be able to get any other developer to agree to terms as favorable to WWE as the WWE License and, therefore, could have damages in excess of THQI's prepetition liability.

18.    In addition to WWE's claims, absent the WWE Agreements Yuke's would have an aggregate claim against THQI of approximately $15 million to $20 million for development services on WWE 2013 and WWE 2014.

19.    THQI negotiated a series of agreements with Take-Two, WWE and Yuke's to terminate the WWE License and the Yuke's Master Developer Agreement and transition development of WWE Games to Take-Two.

**C.    Proposed Transactions.**

20.    Take-Two expressed interest in the WWE Assets but informed the Debtors that it was unwilling to assume the Debtors' obligations under the WWE License and the Yuke's Master Developer Agreement. Take-Two is willing to enter into new agreements with WWE and Yuke's to develop the WWE Games going forward. Take-Two's agreement with WWE and Yuke's will result in the mitigation of damages to WWE and Yuke's arising from THQI's termination of their contracts and will benefit the Debtors' estates by eliminating the prepetition claims of WWE and Yuke's.

21.    Subject to Bankruptcy Court approval, the Debtors have agreed to enter into the following related transactions (together, the "**WWE Agreements**"), each of which shall

become effective and binding on the parties immediately upon entry of order approving the

WWE Agreements (the "**Effective Date**"):

>   a.    the *License Termination Agreement* dated February 11, 2013, by and among WWE and THQI (the "**WWE Termination Agreement**"), attached hereto as **Exhibit B**;

>   b.    the *Yuke's Development Agreement Termination Agreement* dated February 11, 2013, by and among Yuke's and THQI (the "**Yuke's Termination Agreement**"), attached hereto as **Exhibit C**; and

>   c.    the *Asset Purchase Agreement dated as of February 11, 2013, By and Between Take-Two Interactive Software, Inc. and THQ Inc.* (the "**Take-Two Agreement**"), attached hereto (without Schedules) as **Exhibit D**.[2]

### RELIEF REQUESTED

22.    By this Motion, the Debtors seek entry of an order approving the terms of

the WWE Agreements pursuant to Sections 105(a), 363(b) and 365 of the Bankruptcy Code and

Bankruptcy Rules 9019(a).  The WWE Agreements collectively provide for the following:

>   d.    The WWE License shall be terminated and THQI will stop developing future WWE Games and stop selling WWE Games developed in the past;

>   e.    WWE will waive all prepetition claims against THQI and all claims that might otherwise arise from rejection or termination of the WWE License, including, without limitation, any claim based on the minimum guaranteed annual royalty advance for the remaining years of the WWE License.  THQI and WWE will exchange general releases;

>   f.    THQI will pay WWE its royalty payments for sales of WWE Games during the chapter 11 case (estimated to be approximately $650,000);

>   g.    The Yuke's Master Developer Agreement will be terminated immediately and Yuke's will be permitted to enter into a new development agreement with Take-Two;

---

[2]    The "Assumed Contracts" and related cure amounts under the Take-Two Agreement are set forth on **Exhibit E** attached hereto.  To the extent the Assumed Contracts set forth on Exhibit E differ from those set forth in the Take-Two Agreement, the Take-Two Agreement shall control.

h.   THQI will transfer to Yuke's THQI's equity securities in Yuke's, in exchange for Yuke's release of its prepetition claims of approximately $15 million to $20 million against THQI.  THQI and Yuke's will exchange general releases;

i.   THQI will pay to Yuke's $250,000 in settlement of Yuke's claim for royalties based on sales of WWE Games during the chapter 11 case (THQI contends it owes no such royalties because it has not fully recouped its development costs and Yuke's contends it has an administrative claim of approximately $650,000);

j.   THQI will transfer the equipment used by the WWE Fight Team to Take-Two,[3] which will hire the members of the Fight Team (reducing THQI's potential severance liabilities and assuming the obligation to these employees for paid time off, which totals approximately $140,000) and enter into new agreements with WWE and Yuke's to develop WWE Games in the future.

The WWE Agreements are subject to approval of the Bankruptcy Court and shall become effective on the date that the Court enters its Order approving the WWE Agreements.

## BASIS FOR RELIEF REQUESTED

**A.   The WWE Agreements Should Be Approved Under Sections 363, 365 and 105 of the Bankruptcy Code and Bankruptcy Rule 9019.**

23.   The WWE Agreements are in the best interests of the Debtors and their estates.  Accordingly, they should be approved under Sections 363, 365 and 105 of the Bankruptcy Code and Bankruptcy Rule 9019.

24.   The transactions embodied in the WWE Agreements:  (i) are fair and equitable; (ii) represent a settlement of potential disputes and claims under the WWE License and the Yuke's Mater Development Agreement that is in the reasonable range of potential litigation outcomes; (iii) is a mutually beneficial consensual termination of executory contracts that will eliminate large damage claims that would otherwise arise from rejection of contracts that THQI is not in a position to assume and for which THQI has been unable to find a buyer at

---

[3]   The equipment used by the fight team includes development kits of which the Debtors have possession under executory contracts with Microsoft and Sony.  The Debtors will work with Take-Two to obtain the consent of Microsoft and Sony to the transfer of these development kits.

any price because no one has been willing to assume THQI's obligations under the WWE License and the Yuke's Master Developer Agreement; and (iv) obviates the expense, delay, inconvenience and uncertainty that would attend any litigation of the disputes that would arise if the WWE License and the Yuke's Master Developer Agreement were rejected.  Therefore, the WWE Agreements satisfy Bankruptcy Code § 363 and Bankruptcy Rule 9019 and should be approved by the Court.

       25.     Under section 363(b) of the Bankruptcy Code the WWE Agreements should be approved because they are a reasonable exercise of the Debtors' business judgment. The WWE Agreements have a sound business purpose and represent the exercise of THQI's sound business judgment and, accordingly, any actions required to effectuate the terms of the WWE Agreements should be authorized and approved pursuant to Section 363(b).  *See In re Lionel Corp.*, 722 F. 2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a 363(b) application expressly find from the evidence presented before him a good business reason to grant the application."); *In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. Del. 1991).  The foregoing reasons also establish that "cause" exists for the court to modify the automatic stay, to the extent that it applies, pursuant to Section 362(d)(1), to effectuate the terms of the WWE Agreements.  *See* 11 U.S.C. § 362(d)(1) ("[T]he court shall grant relief from the stay provided under subsection (a) of this section . . . for cause[.]").

       26.     The WWE License and the Yuke's Master Developer Agreements are both executory contracts.  Pursuant to Bankruptcy Code § 365 a debtor in possession's decision to assume or reject or modify such executory contracts should be approved if it is  a reasonable exercise of business judgment.  Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject an executory contract or an unexpired

lease." 11 U.S.C. § 365(a); *see Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d

1065, 1075 (3d Cir. 1992); *see also In re Penn Traffic Co.*, 524 F.3d 373 (2d Cir. 2008).  The

Court may approve a debtor's rejection of an executory contract or unexpired lease if such

rejection is made in the exercise of such debtor's sound business judgment, and if such rejection

benefits its estate.  *See, e.g., In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009)

(A debtor's decision to assume or reject an executory contract will stand so long as "a reasonable

business person would make a similar decision under similar circumstances."); *In re*

*Philadelphia Newspapers, LLC*, 424 B.R. 178, 182 (Bankr. E.D. Pa. 2010) ("The standard

applied to determine whether the rejection of an executory contract or unexpired lease should be

authorized is the 'business judgment' standard."); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib.*

*Corp.*, 872 F.2d 36, 39 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco (In re Bildisco)*, 682

F.2d 72, 79 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984); *Westbury Real Estate Ventures, Inc. v.*

*Bradlees, Inc. (In re Bradlees, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996) ("[u]nder the

business judgment test, . . . [a court should approve a debtor's proposed rejection] if the debtor

can demonstrate that rejection will benefit the estate").  It is enough if a debtor determines in its

business judgment that a benefit will be realized.  *Sharon Steel Corp.*, 872 F.2d at 39 (citing

*Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel*

*Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)); *In re Balco Equities, Inc.*, 323 B.R. 85, 99

(Bankr. S.D.N.Y. 2005) ("In determining whether the debtor has employed reasonable business

discretion, the court for the most part must only determine that the rejection will likely benefit

the estate.").  The business judgment standard requires that the Court approve the debtor's

business decision unless that judgment is the product of bad faith, whim or caprice.  *In re*

*Philadelphia Newspapers, LLC*, 424 BR 178, 182-83 (Bankr. E.D. Pa. 2010); *In re Trans World*

*Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001); *Lubrizol Enter., Inc. v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985) *cert. denied* 475 U.S. 1057 (1986). Here THQI, WWE and Yuke's have agreed to terminate the executory contracts on mutually beneficial terms that are far better for the estates than simple rejection.

27.    The WWE Agreements eliminate very large damage claims that would otherwise arise under the WWE License and the Yuke's Master Developer Agreement, by working cooperatively with WWE, Yuke's and Take-Two to mitigate any harm that might otherwise arise from rejection of these executory contracts. THQI has been unable to find any buyer willing to assume its obligations under the WWE License or the Yuke's Master Developer Agreement. THQI is no longer able to perform under these executory contracts. Simple rejection of these contracts and cessation of the development of WWE 2014 would cause both Yuke's and WWE substantial damages, which would increase their claims against THQI. Absent the WWE Agreements, THQI believes that the aggregate claims that would be asserted by WWE and Yuke's would easily exceed $30 million and WWE and Yuke's appear to contend these damages could have exceeded $60 million. Moreover, cessation of development would result in termination of the WWE Fight Team, which would be bad for these employees and would increase THQI's severance liabilities and liability for paid time off, which Take-Two is assuming.

28.    In exchange for the benefits to be derived under the WWE Agreements, THQI has agreed to (a) transfer to equipment currently used by the THQ Fight Team, which is worth no more than $75,000, and the work in process for WWE 2014, which has no realizable value to THQI, (b) pay WWE the royalty it is owed for WWE Games sold during the chapter 11 case, (c) pay Yuke's a reasonable compromise of its disputed claim for royalties for WWE

Games sold during the chapter 11 case, and (d) transfer to Yuke's the illiquid equity that THQI owns in Yuke's, which has a value of no more than $4.5 million if it could be liquidated at all.

29.    Authorizing the Debtors to enter into and effectuate the terms of the WWE Agreements is well within the equitable powers of this court. *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]."); *see also Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

30.    As an integral component of the Debtors' chapter 11 efforts to optimize the recovery of unsecured creditors, by, among other things, eliminating unnecessary operating costs, THQI, in its business judgment, has determined that it is in its best business interest to avoid the accrual of any further obligations under the WWE License and Yuke's Master Developer Agreement. The Debtors marketed the WWE Assets, and no potential buyers were willing to assume the obligations necessary to purchase the WWE Assets. The WWE License and the Yuke's Master Developer Agreement are burdensome to the Debtors. The decision to terminate these agreements will eliminate the THQI's obligation to perform under these agreements and the accrual of any further obligations thereunder. Accordingly, the Debtors submit that consensual termination of the WWE License and Yuke's Master Developer Agreement is within their sound business judgment and is in the best interest of the Debtors,

their estates, creditors and other parties-in-interest.

31.     The Committee agrees with the Debtors' business judgment and supports the Motion.

32.     To the extent that the WWE Agreements include the settlement or compromise of potential claims against THQI, they can and should be approved under Bankruptcy Rule 9019, because they are a reasonable exercise of the Debtors' business judgment. *See In re Marvel Entertainment Group, Inc.*, 222 B.R. 243 (D. Del. 1998) (proposed settlement held in best interest of the estate); *In re Mavrode*, 205 B.R. 716, 721 (Bankr. D.N.J. 1997). Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P 9019(a). Compromises and settlements are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)). The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored in bankruptcy." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see also In re Penn Central Transp. Co.*, 596 F.2d 1102 (3d Cir. 1979).

33.     "[T]he decision whether to approve a compromise under Bankruptcy Rule 9019 is committed to the sound discretion of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the estate." *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997) (declining to approve settlement found to be *sub rosa* plan). Courts should not, however, substitute their judgment for that of the debtor, but instead canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness. *See In re*

*Neshaminy Office Building Assoc.*, 62 B.R. 798, 803 (E.D. Pa. 1986); *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 22 (1983); *see also In re World Health Alternatives, Inc.*, 344 B.R. at 296 ("The court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted).

34.    Absent the WWE Agreements the total allowed claims of WWE and Yuke's would be far greater than they will be under the WWE Agreements. Indeed, their aggregate claims would certainly exceed $30 million and might exceed $60 million. By working together to transition development of WWE Games going forward the parties have minimized the harm to WWE and Yuke's, which have, in turn, agreed to substantial reductions of their claims against the Debtors. Yuke's has agreed to accept its illiquid Yuke's Equity in satisfaction of its prepetition claims. WWE has agreed to waive its prepetition claims entirely. The WWE Agreements are good for all parties because they minimize the harm caused by the termination of the WWE License and the Yuke's Master Developer Agreement.

## SATISFACTION OF BANKRUPTCY RULES 6004(a), 6004(h), 6006(c) AND 6006(d)

35.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rules 6004(a) and 6006(c) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

36.    Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel for the Committee; (c) all parties requesting notice pursuant to Bankruptcy Rule 2002; (d) the attorneys general for each of the

States in which the Debtors conduct operations; (e) all taxing authorities having jurisdiction over any of the Acquired Business, including the Internal Revenue Service; (f) the Environmental Protection Agency; (g) all parties that are known or reasonably believed to have asserted any lien, encumbrance, claim or other interest in any part of the Acquired Business; (h) each governmental agency that is an interested party with respect to the transactions proposed under the WWE Agreements; and (i) all non-Debtor parties to Assumed Contracts.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:    February 12, 2013
          Wilmington, Delaware

_____
Michael R. Nestor (No. 3526)
M. Blake Cleary (No. 3614)
Jaime Luton Chapman (No. 4936)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

                   -and-

Oscar Garza (CA No. 149790)
Jeffrey C. Krause (CA No. 94053)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-1512
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

*Counsel to the Debtors and Debtors in Possession*