**EXHIBIT D**
**TAKE-TWO AGREEMENT**

**Execution Version**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF FEBRUARY 12, 2013**

**BY AND BETWEEN**

**TAKE-TWO INTERACTIVE SOFTWARE, INC.**

**AND**

**THQ INC.**

**TABLE OF CONTENTS** *(continued)*

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS .................................................................................................2
    Section 1.1    Definitions..........................................................................................2
    Section 1.2    Other Definitions and Interpretive Matters.............................12

ARTICLE II PURCHASE AND SALE ............................................................................13
    Section 2.1    Purchase and Sale of the Acquired Assets................................13
    Section 2.2    Excluded Assets ..............................................................................15
    Section 2.3    Assumed Liabilities .......................................................................16
    Section 2.4    Excluded Liabilities .......................................................................17
    Section 2.5    Assignments; Determined Cure Costs ......................................19
    Section 2.6    Further Actions and Assurances ................................................20

ARTICLE III PURCHASE PRICE ..................................................................................21
    Section 3.1    Purchase Price.................................................................................21
    Section 3.2    <Intentionally Omitted> ...............................................................21
    Section 3.3    <Intentionally Omitted> ...............................................................21
    Section 3.4    Discharge of Assumed Liabilities After Closing ......................21
    Section 3.5    <Intentionally Omitted> ...............................................................21

ARTICLE IV CLOSING...................................................................................................21
    Section 4.1    Closing Date.....................................................................................21
    Section 4.2    Buyer's Deliveries .........................................................................21
    Section 4.3    Seller's Deliveries..........................................................................22

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER ..................23
    Section 5.1    Organization and Good Standing................................................23
    Section 5.2    Authority; Validity; Consents ......................................................23
    Section 5.3    No Conflict.......................................................................................23
    Section 5.4    Environmental and Health and Safety Matters .......................24
    Section 5.5    Title to Acquired Assets................................................................24
    Section 5.6    Taxes ................................................................................................24
    Section 5.7    Legal Proceedings..........................................................................25
    Section 5.8    Compliance with Laws; Acquired Permits ...............................25
    Section 5.9    Intellectual Property......................................................................25
    Section 5.10    Assumed Contracts .......................................................................26
    Section 5.11    Brokers or Finders.........................................................................26
    Section 5.12    Affiliate Transactions....................................................................26
    Section 5.13    Insurance .........................................................................................26
    Section 5.14    Financial Statements .....................................................................27
    Section 5.15    Assets Necessary to Business .....................................................27

**TABLE OF CONTENTS** *(continued)*

Page

Section 5.16   Employee Benefits ...................................................................27
Section 5.17   Subsidiaries ............................................................................28
Section 5.18   No Changes .............................................................................28
Section 5.19   Schedule B; Cure List ..............................................................28
Section 5.20   Channel Inventory and Acquired Inventory ...............................28

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER.................29

Section 6.1   Organization and Good Standing................................................29
Section 6.2   Authority; Validity; Consents ....................................................29
Section 6.3   No Conflict...............................................................................29
Section 6.4   Brokers or Finders....................................................................30

ARTICLE VII COVENANTS ................................................................................30

Section 7.1   Access to the Acquired Business; Interim Deliveries...............30
Section 7.2   Operations Prior to the Closing Date ........................................31
Section 7.3   Reasonable Efforts ...................................................................32
Section 7.4   Bankruptcy Court Filings and Approval.....................................33
Section 7.5   Europe Channel Inventory ........................................................34
Section 7.6   Communications with Customers and Suppliers ........................34
Section 7.7   Employee Matters .....................................................................34
Section 7.8   Shared Lot; Shared Assets and Liabilities .................................36
Section 7.9   Updates to Schedule C .............................................................38

ARTICLE VIII ADDITIONAL AGREEMENTS .......................................................38

Section 8.1    Taxes .....................................................................................38
Section 8.2    Payments Received .................................................................39
Section 8.3    Assumed Contracts; Adequate Assurance of Future Performance...........39
Section 8.4    Confidentiality .......................................................................39
Section 8.5    Acquired Assets "AS IS"; Buyer's Acknowledgment Regarding Same ...39
Section 8.6    Nonsurvival of Representations and Warranties........................40
Section 8.7    Post-Closing Access................................................................40
Section 8.8    Privacy Policy ........................................................................41
Section 8.9    DNS Servers...........................................................................41
Section 8.10   Price Protections ....................................................................41
Section 8.11   Music LOIs .............................................................................41

ARTICLE IX CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO
        CLOSE.................................................................................................42

Section 9.1   Accuracy of Representations ....................................................42
Section 9.2   Seller's Performance ................................................................42
Section 9.3   No Order .................................................................................42
Section 9.4   Seller's Deliveries....................................................................42
Section 9.5   Sale Order; Final Order.............................................................42
Section 9.6   Assumed Contracts ..................................................................42

## TABLE OF CONTENTS *(continued)*

Page

ARTICLE X CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO
      CLOSE .................................................................................................................42

    Section 10.1   Accuracy of Representations .................................................42
    Section 10.2   Buyer's Performance ...........................................................43
    Section 10.3   Licensor Settlement Agreement............................................43
    Section 10.4   No Order .............................................................................43
    Section 10.5   Buyer's Deliveries ...............................................................43

ARTICLE XI TERMINATION.......................................................................................43

    Section 11.1   Termination Events..............................................................43
    Section 11.2   Effect of Termination...........................................................45

ARTICLE XII GENERAL PROVISIONS .......................................................................45

    Section 12.1   Public Announcements .........................................................45
    Section 12.2   Notices ...............................................................................45
    Section 12.3   Waiver................................................................................46
    Section 12.4   Entire Agreement; Amendment .............................................46
    Section 12.5   Assignment .........................................................................47
    Section 12.6   Severability ........................................................................47
    Section 12.7   Expenses ............................................................................47
    Section 12.8   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver...47
    Section 12.9   Counterparts.......................................................................48
    Section 12.10  Parties in Interest; No Third Party Beneficiaries .....................48
    Section 12.11  Non-Recourse .....................................................................48
    Section 12.12  Schedules; Materiality .........................................................48
    Section 12.13  Specific Performance ...........................................................48
    Section 12.14  Survival..............................................................................49

# SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Copyrights |
| Schedule 1.1(b) | Patent Rights |
| Schedule 1.1(c) | Products, Product Registrations |
| Schedule 1.1(d) | Trademarks |
| Schedule 1.1(e) | Knowledge |
| Schedule 2.1(e) | Owned Real Property |
| Schedule 2.1(f) | Listed General Contracts |
| Schedule 2.1(f) | HR |
| Schedule 2.1(f) | Corporate Vendor |
| Schedule 2.1(f) | Distribution |
| Schedule 2.1(f) | Intercompany Agreements |
| Schedule 2.1(f) | Licenses |
| Schedule 2.1(f) | Music Licenses |
| Schedule 2.1(f) | Online Contracts |
| Schedule 2.1(f) | Developer |
| Schedule 2.1(f) | Finance |
| Schedule 2.1(f) | License Platform |
| Schedule 2.1(f) | Marketing Agreements |
| Schedule 2.1(f) | Miscellaneous |
| Schedule 2.1(f) | Retail Sales Vendor |
| Schedule 2.1(f) | WFH & Consulting |
| Schedule 2.1(f) | Developer Middleware |
| Schedule 2.1(f) | Employee Agreements |
| Schedule 2.2(g) | Certain Excluded Assets, Property, Rights |
| Schedule 2.2(j) | Excluded Insurance Policies |
| Schedule 3.5 | Allocation Schedule |
| Schedule 5.1 | Organization and Good Standing |
| Schedule 5.4 | Environmental and Health and Safety Matters |
| Schedule 5.5 | Title to Acquired Assets |
| Schedule 5.6 | Taxes |
| Schedule 5.7 | Legal Proceedings |
| Schedule 5.8 | Compliance with Laws; Permits |
| Schedule 5.9(a)(i) | Patent Rights |
| Schedule 5.9(a)(ii) | Copyright Registrations and Applications |
| Schedule 5.9(a)(iii) | Trademark Registrations and Applications |
| Schedule 5.9(a)(iv) | Material Common Law Trademarks |
| Schedule 5.9(a)(v) | Domain Names |
| Schedule 5.9(b) | Intellectual Property |
| Schedule 5.9(c) | Intellectual Property Proceedings |
| Schedule 5.10 | Assumed Contracts |
| Schedule 5.11 | Brokers and Finders |
| Schedule 5.12 | Affiliate Transactions |
| Schedule 5.13 | Insurance |
| Schedule 5.14 | Financial Statements |
| Schedule 5.15 | Assets Necessary to Business |

Schedule 5.16          Employee Benefit Plans
Schedule 5.17          Subsidiaries
Schedule 5.18          No Changes
Schedule 5.20(a)       Channel Inventory and Acquired Inventory
Schedule 5.20(b)       Price Protections
Schedule 7.2           Operations Prior to Closing Date
Schedule 7.5           Avoidance Action Persons
Schedule A             Additional Listed Contracts
Schedule B             Cure Costs
Schedule C             Assumed Contracts

## EXHIBITS

Exhibit 1              Form of Assignment and Assumption Agreement
Exhibit 2              Form of Sale Order
Exhibit 4.3(a)         Form of Assignment of Patents
Exhibit 4.3(b)         Form of Assignment of Trademarks
Exhibit 4.3(c)         Form of Assignment of Copyrights
Exhibit 4.3(d)         Form of Assignment of Domain Names

## APPENDICES

Appendix A             Additional Acquired Assets
Appendix B             Music LOIs

## TABLE OF DEFINED TERMS

The following terms have the meanings set forth on the pages referenced below:

| Term | Page | Term | Page |
|------|------|------|------|
| $ | 13 | Buyer's Interim Access Manager | 32 |
| Accounts Receivable | 3 | Cash and Cash Equivalents | 5 |
| Acquired Assets | 15 | Channel Inventory | 30 |
| Acquired Business | 3 | Chapter 11 Cases | 1 |
| Acquired Copyrights | 3 | Claims | 5 |
| Acquired Documents | 16 | Closing | 23 |
| Acquired Domain Names | 3 | Closing Date | 23 |
| Acquired Equipment | 3 | Closing Legal Impediment | 44 |
| Acquired Intellectual Property | 3 | Code | 5 |
| Acquired Inventory | 3 | Contract | 5 |
| Acquired IT Systems | 3 | Copyrights | 5 |
| Acquired Lot | 2 | Cure Costs | 5 |
| Acquired Patent Rights | 3 | Cure List | 30 |
| Acquired Permits | 3 | Current Business Employees | 37 |
| Acquired Pre-Paid Expenses | 3 | Debtors | 1 |
| Acquired Products | 2 | Deferred Compensation Plan Trust | 5 |
| Acquired Trademarks | 4 | Determined Cure Costs | 5 |
| Added Contract | 40 | Developer | 5 |
| Affiliate | 4 | Development Agreement | 5 |
| Agreement | 1 | Documents | 6 |
| Assignment of Copyrights | 23 | Domain Names | 6 |
| Assignment of Domain Names | 23 | EEC | 8 |
| Assignment of Patents | 23 | Employees | 6 |
| Assignment of Trademarks | 23 | Employment Offer | 36 |
| Assumed Contracts | 15 | Encumbrance | 6 |
| Assumed Liabilities | 18 | Entire Business | 2 |
| Assumption Agreement | 4 | Environmental, Health and Safety Laws | 25 |
| Audited Financial Statements | 28 | Equipment | 6 |
| Avoidance Actions | 4 | ERISA | 6 |
| Bankruptcy Case | 4 | ERISA Affiliate | 6 |
| Bankruptcy Code | 4 | Europe Channel Inventory | 30 |
| Bankruptcy Court | 1 | Excluded | 7 |
| Benefit Arrangements | 29 | Excluded Assets | 17 |
| Benefit Plan | 4 | Excluded Benefit Plan | 17 |
| Business | 4 | Excluded Business | 7 |
| Business Day | 4 | Excluded Copyrights | 7 |
| Business Employee | 4 | Excluded Documents | 7 |
| Buyer | 1 | Excluded Domain Names | 7 |
| Buyer Termination Notice | 46 | Excluded Equipment | 7 |

Excluded Intellectual Property.................... 7
Excluded Inventory..................................... 7
Excluded IT Systems ................................. 7
Excluded Liabilities ................................. 19
Excluded Lots ............................................ 2
Excluded Patent Rights .............................. 7
Excluded Permits ....................................... 7
Excluded Pre-Paid Expenses...................... 7
Excluded Trademarks ................................ 7
Execution Date........................................... 1
Executory Music LOI .............................. 43
Fight Team .............................................. 36
Fight Team Expenses ............................... 37
Final Order................................................ 7
Financial Statements ............................... 28
Friendco Acquired Assets .......................... 8
Friendco Assumed Liabilities .................... 8
Friendco Purchase Agreement.................... 1
Governmental Authority ............................ 8
Hazardous Substance ................................. 8
Hearing Date ............................................. 8
HSR Act .................................................... 8
Identified .................................................. 8
Inbound License Agreements ................... 27
Intellectual Property.................................. 8
Interim Financial Statements ................... 28
Inventions.................................................. 8
Inventory ................................................... 9
IRS ........................................................... 9
IT Systems ................................................ 9
Knowledge ................................................ 9
Law .......................................................... 9
Lease ........................................................ 9
Legacy Business........................................ 1
Liability.................................................... 9
License Agreement .................................... 9
Licensor.................................................... 9
Lots .......................................................... 2
Marketing Materials.................................. 9
Material Adverse Effect........................... 10
Music LOIs ............................................... 3
Music Order ............................................ 43
Nonassignable Assets............................... 22
Order ...................................................... 10
Ordinary Course of Business ................... 10
Other Acquirers....................................... 38

Outside Date............................................ 46
Party or Parties....................................... 10
Patent Rights .......................................... 10
Permits ................................................... 10
Permitted Encumbrances ......................... 10
Person..................................................... 10
Pre-Paid Expenses................................... 10
Primarily Related .................................... 11
Privacy Policy ........................................ 11
Proceeding.............................................. 11
Product Know-How ................................. 11
Product Registrations .............................. 11
Products.................................................... 1
Purchase Price........................................ 22
Real Property .......................................... 11
Related ................................................... 11
Release ................................................... 11
Remainder Employees ............................. 11
Remaining Lots......................................... 2
Removed ................................................ 11
Reorganization Completion ..................... 39
Representative......................................... 11
Sale Hearing........................................... 12
Sale Order .............................................. 12
Sellers Termination Notice ...................... 47
Sellers' Interim Access Manager.............. 32
Shared Assets and Liabilities................... 39
Shared Domain Names ............................ 39
Software ................................................. 12
Sold Lot.................................................... 1
Specified Excluded Assets and Liabilities 39
Subdomain Names ................................... 39
Subsidiary .............................................. 12
Tax or Taxes .......................................... 12
Tax Return ............................................. 12
Third Party ............................................. 12
THQ ......................................................... 1
Trademarks ............................................ 12
Transaction Documents ........................... 13
Transfer Consent..................................... 25
Transfer Taxes ....................................... 40
Transferred Employee.............................. 37
Treasury Regulations .............................. 13
Unscheduled Shared Assets and Liabilities
............................................................. 39
WARN Act.............................................. 13

Wells Fargo .............................................. 13

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made as of February 12, 2013 (the "**Execution Date**"), by and between **Take-Two Interactive Software, Inc.**, a Delaware corporation ("**Buyer**") and **THQ Inc.**, a Delaware corporation ("**Seller**"). Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Article I.

## RECITALS

**WHEREAS**, Seller is (or was) engaged in the business of developing, licensing, marketing and selling certain interactive entertainment software products, that are (or were) owned or controlled directly or indirectly by Seller or any of its Subsidiaries, or which Seller or any of its Subsidiaries have (or had) the legal right to use (such products, the "**Products**" and such business, the "**Legacy Business**");

**WHEREAS**, on December 19, 2012, Seller, THQ Wireless Inc., Volition, Inc. and Vigil Games, Inc. (the "**Debtors**") filed a voluntary petition for relief commencing a case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS**, the Debtors entered into separate Asset Purchase Agreements (each, a "**Friendco Purchase Agreement**"), each by and among the Sellers and a counterparty (or counterparties) thereto (each counterparty (or counterparties) to a Friendco Purchase Agreement, a "**Friendco**"), relating to the purchase of certain assets and the assumption of certain liabilities Primarily Related to the Products identified on Schedule 1.1(c) and assigned to the following categories (each, a "**Sold Lot**"):

| Sold Lots |
|-----------|
| Volition |
| Relic |
| Montreal |
| SouthPark |
| Homefront |
| Metro |
| Evolve |

**WHEREAS**, Seller continues to conduct the Legacy Business with respect to the Products identified on Schedule 1.1(c) (and all software products in development (x) owned by Seller or any of its Subsidiaries or (y) which they have the legal right to use) and assigned to the following categories (the "**Remaining Lots**" and, together with the Sold Lots, the "**Lots**"):

| Lot | Acquired or Excluded |
|-----|----------------------|
| WWE | Acquired |
| Vigil | Excluded |
| Shared | Excluded |
| Estate | Excluded |

1

WHEREAS, "**Acquired Lot**" means the Lot designated as "Acquired" in the foregoing table; "**Acquired Products**" means the Products designated on Schedule 1.1(c) as part of the Acquired Lots; "**Excluded Lots**" means the Sold Lots and the Lots designated as "Excluded" in the foregoing table; "**Entire Business**" means the Legacy Business, as conducted with respect to the Remaining Lots;

WHEREAS, Seller desires to sell to Buyer certain assets and transfer to Buyer certain liabilities and Buyer desires to purchase from Seller such assets and assume such liabilities, upon the terms and conditions set forth herein and as authorized under, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order by the Bankruptcy Court under, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, the Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order; and

WHEREAS, Buyer has negotiated a new license agreement with Licensor (as defined below) relating to the Acquired Business (as defined below) and Licensor and the Debtors have entered into a settlement agreement, in each case subject to and conditioned upon successful consummation of the transactions contemplated by this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1      Definitions. For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"**Accounts Receivable**" means all of Seller's trade accounts receivable and other rights to payment from customers, licensees or other third parties to the extent arising out of or related to the operation of the Entire Business.

"**Acquired Business**" means the Business of the Acquired Lot, including the Acquired Products.

"**Acquired Copyrights**" means: (a) the Copyrights Identified on Schedule 1.1(a), and (b) all Copyrights Primarily Related to the Acquired Business, in each case other than the Copyrights Excluded on Schedule 1.1(a).

"**Acquired Domain Names**" means: (a) the Domain Names Identified on Schedule 5.9(a)(v), and (b) all Domain Names Primarily Related to the Acquired Business, in each case

2

other than the Domain Names Excluded on Schedule 5.9(a)(v).

"**Acquired Equipment**" means all Equipment Primarily Related to the Acquired Business.

"**Acquired Intellectual Property**" means, collectively, (a) all Acquired Copyrights, (b) all Acquired Patent Rights, (c) all Acquired Trademarks, (d) all Product Know-How that is Primarily Related to the Acquired Business, (e) all Acquired Domain Names, (f) all Inventions that are Primarily Related to the Acquired Business, (g) all other intellectual property owned by Seller, licensed to Seller or which Seller has the legal right to use, as the term intellectual property is defined in Section 101(35A) of the Bankruptcy Code, including Software that is Primarily Related to the Acquired Business, and (h) all of Seller's right, title and interest of whatever kind and nature forever and throughout the universe in and to the Intellectual Property that is Primarily Related to the Acquired Business or any Product Identified on Schedule 1.1(c), which for the avoidance of doubt and without limitation shall include all of Seller's right, title and interest to (x) all source code and object code versions of Products Identified on Schedule 1.1(c), (y) the Intellectual Property that is Primarily Related to the Acquired Business or any Product Identified on Schedule 1.1(c) and (z) all Intellectual Property and rights of use granted pursuant to the Contracts set forth on Appendix B (the "**Music LOIs**").

"**Acquired Inventory**" means all Inventory Primarily Related to the Acquired Business or the Products Identified on Schedule 1.1(c).

"**Acquired IT Systems**" means all IT Systems that are exclusively related to the Acquired Business.

"**Acquired Patent Rights**" means: (a) the Patent Rights Identified on Schedule 1.1(b), and (b) all Patent Rights that are Primarily Related to the Acquired Business, in each case other than the Patent Rights Excluded on Schedule 1.1(b).

"**Acquired Permits**" means all Permits that are Primarily Related to the Acquired Business.

"**Acquired Pre-Paid Expenses**" means all Pre-Paid Expenses to the extent Primarily Related to any Assumed Contract and after applying any such deposits, prepaid charges and expenses against any Determined Cure Costs payable to the third party to whom such deposits, prepaid charges and expenses were paid, but excluding all Pre-Paid Expenses related to any Excluded Asset, and any return of funds from the Deferred Compensation Plan Trust.

"**Acquired Trademarks**" means: (a) the Trademarks Identified on Schedule 1.1(d), and (b) all Trademarks that are Primarily Related to the Acquired Business, in each case other than the Trademarks Excluded on Schedule 1.1(d).

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person. For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have

3

correlative meanings.

"**Assumption Agreement**" means the Assignment and Assumption Agreement substantially in the form of Exhibit 1.

"**Avoidance Actions**" means any and all claims for relief of Seller under chapter 5 of the Bankruptcy Code, or state fraudulent conveyances, fraudulent transfer or other similar state laws.

"**Bankruptcy Case**" means the bankruptcy cases commenced by the Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on December 19, 2012.

"**Bankruptcy Code**" means Title 11 of the United States Code, Sections 101 *et seq.*

"**Benefit Plan**" means, with respect to a Seller, any "employee benefit plan" (including "plans" as defined in ERISA § 3(3)); any material profit sharing, deferred compensation, bonus, stock option, stock purchase, vacation pay, holiday pay, pension, retirement plans, medical and any other material form of compensation or benefit plan, program or arrangement of any kind regardless of whether any such plan is written or oral or provided under an employment, collective bargaining or other similar arrangement.

"**Business**" means, with respect to any Lot, the business, as conducted as of the Execution Date, of developing, licensing and selling the Products designated as belonging to such Lot in Schedule 1.1(c).

"**Business Day**" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required by Law to close.

"**Business Employee**" means any employee of Seller as of December 19, 2012 or the date hereof whose primary responsibility was or is to provide services Primarily Related to the Acquired Business.

"**Cash and Cash Equivalents**" means all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, securities, securities entitlements, instruments and other investments of Seller and all bank accounts and securities accounts, including any cash collateral that is collateralizing any letters of credit.

"**Claims**" means all claims, causes of action, choses in action, rights of recovery and rights of set-off of whatever kind or description against any Person arising out of or relating to any Product, Acquired Asset or Assumed Liability, including the meaning assigned to such term under section 101(5) of the Bankruptcy Code.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contract**" means any contract, agreement, insurance policy, capitalized lease, license, sublicense, sales order, purchase order, instrument or other commitment, whether written or oral, that is binding on any Person or any part of its property under applicable Law.

"**Copyrights**" means: (a) the copyright registrations and applications for registration identified on Schedule 1.1(a); (b) works of authorship whether or not copyrightable in published and unpublished works; and (c) any other copyrights and works, together with all copyrightable materials and common law rights, and any applications and registrations therefor, owned by a Seller or which a Seller has the legal right to use (including any license or other rights of a Seller, whether as a licensor, a licensee or otherwise, relating to any of the foregoing).

"**Cure Costs**" means, amounts that (i) must be paid and obligations that otherwise must be satisfied, including pursuant to section 365(b)(1)(A),(b)(1)(B) or (f)(2)(b) of the Bankruptcy Code in order to assume and assign the Assumed Contracts, or (ii) are due pursuant to Order of the Bankruptcy Court as a condition to assuming and assigning such Assumed Contract.

"**Deferred Compensation Plan Trust**" means the THQ Management Deferred Compensation Plan, effective January 1, 2005.

"**Determined Cure Costs**" means, in the aggregate, all Cure Costs that have been determined pursuant to a Final Order or pursuant to an agreement between Seller and the counterparty to the applicable Assumed Contract or the applicable Assumed Lease.

"**Developer**" means, Yuke's Co., Ltd., a company organized under the laws of Japan.

"**Development Agreements**" means, (i) that certain Master Developer Agreement, dated as of July 2, 2011, by and between Developer and Seller, and all addenda thereto, and (ii) that certain Master Developer Agreement, dated as of December 1, 2 07, by and between Developer and Seller, and all addenda thereto, each as may be amended from time to time, Related to the Acquired Business and the Products Identified on Schedule 1.1(c).

"**Documents**" means, with respect to the Entire Business and Seller all (a) books, records, manuals, files, invoices, inventory records, product specifications, customer lists, cost and pricing information, supplier lists, business plans, catalogs, customer literature, quality control records and customer records, (b) research, design and development files and records, (c) data relevant to the manufacturing of a Product, and (d) Marketing Materials, in each case including all data and other information stored on discs, tapes or other media.

"**Domain Names**" means any Internet domain names, uniform resource locators, Twitter handles, social media accounts and "pages" including those maintained on Facebook, Twitter and Pinterest, and any other social media and Internet accounts, including all content related thereto, owned, licensed or controlled by Seller and used by Seller in connection with any of the Products or the Entire Business or any portion of the Entire Business.

"**Employees**" means all individuals, as of the date hereof, who are employed by Seller.

"**Encumbrance**" means any charge, lien, interest, security interest, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, transfer restriction or other similar restriction of any kind.

"**Equipment**" means all personal property to which a Seller holds title and currently used

or held for use in the operation of the Entire Business, or any portion of the Entire Business, including all machinery, equipment, replacement and component parts, spare parts, furniture, fixtures, office and other supplies, data processing equipment and peripheral equipment, vehicles, training materials, and videos and other similar personal property, excluding IT Systems.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity that, together with Seller, is:

(a)     a member of a controlled group of corporations within the meaning of Section 414(b) of the Code;

(b)     a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code;

(c)     a member of an affiliated service group within the meaning of Section 414(m) of the Code; or

(d)     a member of a group of organizations required to be aggregated under Section 414(o) of the Code.

"**Excluded**" means, with respect to any item and a particular Schedule, that such item is explicitly listed or described on such Schedule as corresponding to an Excluded Lot.

"**Excluded Business**" means the Entire Business, including the Business of each of the Excluded Lots, but excluding the Acquired Business.

"**Excluded Copyrights**" means all Copyrights other than the Acquired Copyrights.

"**Excluded Documents**" means all Documents other than the Acquired Documents.

"**Excluded Domain Names**" means all Domain Names other than the Acquired Domain Names.

"**Excluded Equipment**" means all Equipment other than the Acquired Equipment.

"**Excluded Intellectual Property**" means all Intellectual Property, other than the Acquired Intellectual Property.

"**Excluded Inventory**" means all Inventory other than the Acquired Inventory.

"**Excluded IT Systems**" means all IT Systems other than the Acquired IT Systems.

"**Excluded Patent Rights**" means all Patent Rights other than the Acquired Patent Rights.

"**Excluded Permits**" means all Permits other than the Acquired Permits.

"**Excluded Pre-Paid Expenses**" means all Pre-Paid Expenses other than the Acquired Pre-Paid Expenses.

"**Excluded Trademarks**" means all Trademarks other than the Acquired Trademarks.

"**Final Order**" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under Section 60(b) of the Federal Rules of Civil Procedure) or a petition for writ of certiorari has expired and no such appeal, motion, or petition is pending.

"**Friendco Acquired Assets**" means the aggregate Acquired Assets, as such term is defined in each of the Friendco Purchase Agreements.

"**Friendco Assumed Liabilities**" means the aggregate Assumed Liabilities, as such term is defined in each of the Friendco Purchase Agreements.

"**Governmental Authority**" means any United States federal, provincial, state, municipal or local or any foreign government, governmental agency or authority, or regulatory or administrative authority, or any court, tribunal or judicial body having jurisdiction, including the Bankruptcy Court.

"**Hazardous Substance**" means any "toxic substance," "hazardous pollutant," "hazardous waste," "hazardous material" or "hazardous substance" under any Environmental, Health and Safety Laws.

"**Hearing Date**" means the date, if ever, on which the Sale Order is entered.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Identified**" means, with respect to any item and a particular Schedule, such item is explicitly identified, listed or described on such Schedule as corresponding to an Acquired Lot.

"**Intellectual Property**" means, collectively, (a) all Copyrights, (b) all Patent Rights, (c) all Trademarks, (d) all Product Know-How, (e) all Domain Names, (f) all Inventions, (g) all moral rights (droit moral), rights of integrity and paternity, neighboring rights, rental and lending rights, name, image and bio of the creator/author, publicity rights and other rights of authors, including the right to authorize, prohibit and/or control the fixation, reproduction and/or other exploitation of the Acquired Assets by any media and means now known or hereafter devised as may be conferred upon Seller or its employees or contractors under applicable laws, regulations or directives, including any so-called rental and lending rights pursuant to any European Economic Community ("**EEC**") directives and/or enabling or implementing legislation, laws or regulations enacted by the member nations of the EEC or similar or analogous provisions of any other jurisdiction or territory creators, (h) all other intellectual property owned by Seller or which Seller has the legal right to use, as the term intellectual property is defined in Section 101(35A) of the Bankruptcy Code, which for the avoidance of doubt and without limitation shall include all of Seller's right, title and interest to all source code and object code versions of Products Identified on Schedule 1.1(c), and (i) all derivatives and improvements arising out of or related

7

to any of the above described items including all translations, adaptations and compilations of any of the foregoing.

"**Inventions**" means all inventions of Seller and its Affiliates related to the Products and used by Seller in connection with any of the Products and/or the Entire Business, or any portion of the Entire Business, whether or not such inventions are the subject of a patent or patent application or otherwise constitute protectable intellectual property, including game engines and related tools, computer software and hardware, front-end and back-end architecture and systems, interfaces, applications, source code, object code, graphical and audio assets, designs and documentation.

"**Inventory**" means all raw materials, work-in-process, finished goods, add-ons, expansions packs, strategy guides, supplies, samples, components, packaging materials, and other inventories to which Seller has title that are in the possession of Seller or any Third Party and used or held for use in connection with any Product.

"**IRS**" means the Internal Revenue Service.

"**IT Systems**" means the hardware (excluding any Software) components of the computer and accounting systems (including any peripherals related thereto), networks, interfaces, databases, and passwords or access keys related thereto, owned or leased by Seller and used in or necessary for the conduct of the Entire Business or any portion of the Entire Business, as applicable.

"**Knowledge**" means, with respect to any matter in question, in the case of Seller, the actual knowledge of the matter in question of those persons listed on Schedule 1.1(e), or that knowledge that would, in the normal course of such person's services to Seller, be obtained by such person on inquiry or investigation (with no obligation to make any inquiry or investigation of third parties).

"**Law**" means any foreign or domestic law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction or decree by any Governmental Authority as in effect from time to time, including relative to data protection, import/export and foreign corrupt practices.

"**Lease**" means a lease, sublease, license, or other use or occupancy agreement with respect to the real property to which a Seller is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"**Liability**" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"**License Agreement**" means, collectively (i) that certain Terms of License, by and between Licensor and Seller, and all addenda thereto, and (ii) that certain World Wrestling Entertainment, Inc. Standard Terms and Conditions, executed by each of Licensor and Seller, and all addenda thereto, each as may be amended from time to time, Related to the Acquired Business and the Products Identified on Schedule 1.1(c).

8

"**Licensor**" means, World Wrestling Entertainment, Inc., a Delaware corporation.

"**Marketing Materials**" means all marketing materials, marketing research data, customer and sales information, product literature, promotional materials and data, advertising and display materials (including all underlying designs, samples, charts, diagrams, photos and electronic files related to the foregoing) and all training materials, in each case in whatever form or medium (e.g., audio, visual, digital or print) owned or used by a Seller and Primarily Related to any Acquired Product or Acquired Asset.

"**Material Adverse Effect**" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments and events has had, or would reasonably be expected to have, a material adverse effect on the Acquired Business or the Acquired Assets (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole, or would reasonably be expected to prevent or materially impair the ability of Seller to consummate the transactions contemplated by this Agreement.

"**Order**" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"**Ordinary Course of Business**" means the operation of the Entire Business, or any portion of the Entire Business, as applicable, in the ordinary and usual course consistent with past practice and custom of Seller, including taking any action in accordance with any Contract to which a Seller is a party.

"**Party**" or "**Parties**" means, individually or collectively, Buyer and Seller.

"**Patent Rights**" means (a) any United States and foreign patent owned by Seller, (b) the patents and patent applications identified on Schedule 1.1(b), (c) any other United States and foreign patents and patent applications owned by Seller or licensed from a third party to Seller, (d) any continuation, continuation-in-part and divisional United States and foreign patent applications based on any of the foregoing and any patents issuing therefrom, and (e) any patentable materials.

"**Permits**" means all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances, Product Registrations and Orders that are necessary for Seller to own, lease and operate their properties and assets or to carry on the Entire Business, or any portion of the Entire Business, as it is now being conducted.

"**Permitted Encumbrances**" means (a) Encumbrances for utilities and Taxes not yet due and payable or being contested in good faith; and (b) immaterial materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for the Acquired Business.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"**Pre-Paid Expenses**" means all deposits and prepaid charges and expenses of Seller as of the Closing Date.

"**Primarily Related**" means, with respect to any business, Business, Product, asset or liability, owned or held primarily by, required primarily for, or used, intended for use, leased, licensed, sublicensed, accrued, reserved or incurred primarily in connection with, such business, Business, Product, asset or liability.

"**Privacy Policy**" means Seller's Online Privacy Policy dated as of December 28, 2012.

"**Proceeding**" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority, other than an Avoidance Action.

"**Product Know-How**" means all of Seller's know-how, ideas, trade secrets, confidential and proprietary information, technology, technical information, systems information, processes, methodology and data related to the Products, the Entire Business or any portion of the Entire Business.

"**Product Registrations**" means the approvals, licenses, registrations, listings, franchises, permits, certificates, consents, clearances, or other authorizations and comparable regulatory filings required by any Governmental Authority held by a Seller, including those set forth on Schedule 1.1(c).

"**Real Property**" means all real property owned by Seller and all unexpired leases or other occupancy agreements for real property under which Seller is a lessee (or the equivalent).

"**Related**" means, with respect to any business, Product, asset or liability, owned or held by, required for, or used, intended for use, leased, licensed, accrued, reserved or incurred in connection with, such business, Product, asset or liability.

"**Release**" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment.

"**Remainder Employees**" means Employees who are not Transferred Employees.

"**Removed**" means, with respect to any item and a particular Schedule, such item is explicitly identified, listed or described on such Schedule as being "Remove," "Removed" or "Rejected."

"**Representative**" means, with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Sale Hearing**" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"**Sale Motion**" means the motion filed with the Bankruptcy Court seeking approval of the Sale Order.

"**Sale Order**" means an order of the Bankruptcy Court in the form attached as <u>Exhibit 2</u>, or otherwise in form and substance satisfactory to Buyer in its sole discretion, approving the transactions contemplated hereby and authorizing and directing Seller to consummate such transactions under, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code.

"**Software**" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) documentation including user manuals and other training documentation related to any of the foregoing.

"**Subsidiary**" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the board of directors or similar managing body.

"**Tax**" or "**Taxes**" means any income, alternative, minimum, add-on minimum, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy, or other governmental charge in the nature of a tax, or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto), in each case imposed by any Governmental Authority.

"**Tax Return**" means any return, declaration, report, claim for refund, information return, or other document (including any elections, schedules, statements, or supporting documents attached thereto) filed with or required to be filed with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"**Third Party**" means a Person who or which is neither a Party hereto nor an Affiliate of a Party hereto.

"**Trademarks**" means all trade names, logos, slogans, designs, source identifiers, common law trademarks and service marks, trademark and service mark registrations and applications therefor, in each case owned by a Seller and related to the Products, the Entire Business or the Acquired Assets, and all goodwill appurtenant to any or all of the foregoing, including all of the marks and names identified on Schedule 1.1(d) attached hereto.

"**Transaction Documents**" means this Agreement and any other agreements, instruments

or documents entered into pursuant to this Agreement.

"**Treasury Regulations**" means the regulations promulgated by the U.S. Treasury Department pursuant to the Code.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, any similar Law, and the rules and regulations thereunder.

"**Wells Fargo**" means Wells Fargo Capital Finance, LLC.

Section 1.2        Other Definitions and Interpretive Matters.

(a)        Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i)        When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)        Any reference in this Agreement to "$" means U.S. dollars.

(iii)        Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement. Unless otherwise stated in this Agreement, no reference to or disclosure of any item or other matter in the Exhibits and Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Exhibits and Schedules. No disclosure in the Exhibits and Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. Any information, item or other disclosure set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules if the relevance of such disclosure to such other Schedule is reasonably apparent from the facts specified in such disclosure. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv)        Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v)        The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "**Exhibit**," "**Schedule**," "**Appendix**," "**Section**" or "**Article**" are to the corresponding Exhibit, Schedule, Section or Article of this Agreement unless

otherwise specified.

(vi)     References herein to any contract or agreement (including this Agreement) mean such contract or agreement as amended, supplemented or modified from time to time in accordance with the terms thereof.

(vii)     Words such as "**herein**," "**hereof**" and "**hereunder**" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(viii)     The word "**including**" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)     Reference to any Product shall include such Product's prequels, sequels, add-ons, back catalogue, prior versions, spin-offs and derivative works relative thereto, if any, unless otherwise expressly specified in Schedule 1.1(c).

(x)     If an item is Removed in Schedule B, but such item appears in another Schedule where it is not Removed, such item shall be deemed Removed. If an item is not Removed in Schedule B, but such item appears in another Schedule where it is Removed, such item shall be deemed to not be Removed.

(xi)     If an item is allocated to a particular Lot (including the Shared Lot) in Schedule B, but such item appears in another Schedule and is allocated to a different Lot, then the allocation set forth in Schedule B shall control.

(xii)     Notwithstanding anything herein to the contrary, (A) if a Contract is included on Schedule C it shall be deemed not Removed, regardless of whether it is or is not Removed on Schedule B, and (B) if a Contract (other than a Contract corresponding to the Shared Lot) is not included on Schedule C it shall be deemed Removed, regardless of whether it is or is not Removed on Schedule B.

(b)     No Strict Construction.  Buyer and Seller participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer and Seller, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1     Purchase and Sale of the Acquired Assets.  Upon the terms and subject to the conditions of this Agreement and the Sale Order, on the Closing Date, Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned,

conveyed and delivered, free and clear of any and all Claims, Encumbrances and Liabilities, except (i) as set forth on Schedule 5.5, (ii) for the Assumed Liabilities, (iii) for Permitted Encumbrances and (iv) for any Nonassignable Asset, to Buyer, and Buyer shall purchase, all right, title and interest of Seller in, to or under all of the properties and assets of Seller of every kind and description, wherever located, real, personal or mixed, tangible or intangible, to the extent Primarily Related to the Acquired Business (but excluding in each case, for the avoidance of doubt, any Excluded Assets) (collectively, the "**Acquired Assets**"), including all right, title and interest of Seller in, to or under:

(a)    <intentionally omitted>;

(b)    <intentionally omitted>;

(c)    Acquired Inventory;

(d)    Acquired Equipment;

(e)    <intentionally omitted>;

(f)    (i) all Contracts set forth on Schedule C to this Agreement, which Schedule C shall also set forth the Cure Costs associated with each such Contract and (ii) all Executory Music LOIs ((i) and (ii) together, the "**Assumed Contracts**"); *provided, however,* that such Contracts shall exclude the Contracts Removed from any Schedule;

(g)    <intentionally omitted>;

(h)    <intentionally omitted>;

(i)    Acquired Permits and pending applications therefor;

(j)    Acquired Intellectual Property;

(k)    Products Primarily Related to the Acquired Business, including the Products comprising the Acquired Lot and the Products Identified on Schedule 1.1(c);

(l)    Acquired Pre-Paid Expenses (other than those described in Section 2.2(e));

(m)    Tax refunds, Tax rebates and Tax credits (other than as they relate to Taxes based on net income) exclusively related to the Acquired Business;

(n)    goodwill associated with the Acquired Assets;

(o)    Documents Primarily Related to the Acquired Business or the Acquired Assets (other than those described in Section 2.2), to the extent available and permitted by applicable Laws (the "**Acquired Documents**");

(p)    telephone, telex and telephonic facsimile numbers and other directory listings exclusively related to the Acquired Business;

14

(q)     Claims and Proceedings (including, for the avoidance of doubt, all claims for past infringement or misappropriation of Acquired Intellectual Property) of Seller as of the Closing Primarily Related to or constituting any Acquired Asset or Assumed Liability, including Seller's rights of indemnity, defense, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including insurance proceeds (regardless of whether such rights are currently exercisable) to the extent Primarily Related to any Acquired Asset or any of the Assumed Liabilities, but excluding any Claims or Proceedings Excluded on any Schedule to this Agreement;

(r)     all claims, refunds and credits from insurance policies or binders (other than those policies set forth on Schedule 2.2(j)) due or to become due with respect to such policies or binders and all rights to proceeds thereof, in each case, to the extent Primarily Related to the Acquired Business;

(s)     <intentionally omitted>;

(t)     <intentionally omitted>;

(u)     the Acquired IT Systems and any development hardware, including any IT System, development kits and motion capture equipment loaned, leased, licensed or granted to Developer, Licensor or any other person that is Primarily Related to the Acquired Business or the Products Identified on Schedule 1.1(c);

(v)     any and all milestone feedback, whether in written form or transmitted orally or electronically, and milestone documentation delivered pursuant to or in connection with the Developer Agreements or the License Agreement;

(w)     all development kits and test kits Primarily Related to the Acquired Business or the Products Identified on Schedule 1.1(c);

(x)     rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements Primarily Related to the Acquired Business, any Product Identified on schedule 1.1(c) or any Acquired Asset (or any portion thereof);

(y)     all assets and rights arising or granted under or in connection with the Music LOIs; and

(z)     all assets set forth or described on Appendix A (except as explicitly described as corresponding to the Shared Lot).

Section 2.2     Excluded Assets.  Notwithstanding anything herein to the contrary, the Acquired Assets shall not include any of the Friendco Acquired Assets or any of the following (collectively, the "**Excluded Assets**"):

(a)     each Seller's rights under this Agreement or any Friendco Purchase Agreement (including the right to receive the Purchase Price or the Purchase Price (as defined in any Friendco Purchase Agreement) delivered to Seller pursuant to this Agreement or any Friendco Purchase Agreement);

15

(b)     the Excluded Documents, including Documents prepared in connection with this Agreement, any Friendco Purchase Agreement, or the transactions contemplated hereby, thereby or relating to the Bankruptcy Case, Tax Returns or Tax work papers or records, and other Documents not Primarily Related to the Acquired Business, the Acquired Lot or any Acquired Asset;

(c)     (i) any Contract that is (A) not an Assumed Contract or (B) Excluded or Removed on any Schedule, including on Schedule A and on the Cure List and (ii) any Lease;

(d)     Claims and Proceedings of Seller, including those Excluded on any Schedule, other than those described in Section 2.1(q);

(e)     Excluded Pre-Paid Expenses;

(f)     shares of capital stock or other equity interests of Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of Seller;

(g)     assets, properties and rights of Seller that are (i) not Acquired Assets, (ii) set forth on Schedule 2.2(g), or (iii) Excluded on any Schedule;

(h)     rights under any Benefit Plan Excluded on Schedule 5.16 (each, an "**Excluded Benefit Plan**"), and the Deferred Compensation Plan Trust;

(i)     any interest in or right to any refunds, rebates or credits of Taxes, and any interest in any tax loss or other tax attribute of Sellers;

(j)     insurance policies and binders set forth on Schedule 2.2(j), all claims, refunds and credits from such policies or binders due or to become due with respect to such policies or binders and all rights to proceeds thereof;

(k)     Cash and Cash Equivalents;

(l)     Accounts Receivable;

(m)     Excluded Equipment;

(n)     Excluded Intellectual Property;

(o)     Excluded Inventory;

(p)     Excluded IT Systems;

(q)     the owned Real Property listed on Schedule 2.1(e); and

(r)     the Avoidance Actions.

Section 2.3     Assumed Liabilities.  Upon the terms and subject to the

16

conditions of this Agreement, on the Closing Date, Buyer shall assume and agree to perform and discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following Liabilities of Seller and no others (collectively, the "**Assumed Liabilities**"):

(a)     Liabilities arising from the ownership of the Acquired Assets or the purchase of the Products Identified on Schedule 1.1(c) by Buyer, in each case on and after the Closing Date, it being understood that Liabilities arising from the ownership of the Acquired Assets or the operation of the Entire Business or any portion of the Entire Business prior to the Closing Date (including the sale of Products by Seller and its Affiliates prior to the Closing Date) shall not constitute Assumed Liabilities regardless of when the obligation to pay such Liabilities arises, other than as set forth in Section 8.1; *provided, however*, that notwithstanding the foregoing, the Assumed Liabilities shall include the Liabilities arising from Buyer's movement, possession, use or operation of the Interim Deliveries on and after the date hereof;

(b)     Liabilities under the Assumed Contracts arising on and after the Closing;

(c)     the Determined Cure Costs, only as and to the extent of the amounts set forth on Schedule C;

(d)     postpetition trade payables owed to vendors with which Buyer intends to continue to do business;

(e)     <intentionally omitted>;

(f)     Liabilities to the Transferred Employees: (i) set forth in Sections 7.7(d) and (g); (ii) arising on or after the date hereof, and arising out of or related to Buyer's control or direction of the Current Business Employees on and after the date hereof, pursuant to Section 7.1(b); or (iii) arising on and after the Closing;

(g)     <intentionally omitted>; and

(h)     <intentionally omitted>.

Section 2.4     Excluded Liabilities.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability that is not an Assumed Liability, and Seller shall be solely and exclusively liable with respect to any Liability of Seller that is not an Assumed Liability (such Liabilities, collectively, the "**Excluded Liabilities**").  For the avoidance of doubt, the Excluded Liabilities include the Friendco Assumed Liabilities and the following:

(a)     all Claims or Liabilities of Seller or its Subsidiaries that relate to any of the Excluded Assets, the Leases, the Music LOIs (other than the Executory Music LOIs) or the Contracts that are not Assumed Contracts;

(b)     other than the Assumed Liabilities, all Liabilities of Seller, including

17

arising out of or related to pre-Closing violations of the Privacy Policy and/or all applicable data protection laws and directives;

(c)    except as expressly set forth in Section 2.3(a) and Section 2.3(f), any Liability arising out of any action or proceeding arising out of, or relating to, any occurrence or event happening prior to the Closing;

(d)    all Claims or Liabilities (whether known or unknown) with respect to current or former employees of Seller, including payroll, paid or unpaid vacation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option, equity incentive or profit sharing plans, retention plans, deferred compensation plans, health care plans or benefits, or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind including any Liability pursuant to the WARN Act for any action or inaction, except to the extent specifically set forth in Section 7.7;

(e)    any Liability arising under any Excluded Benefit Plan or any other employee benefit plan, program, or arrangement at any time maintained, sponsored or contributed to by Seller or any ERISA Affiliate, or with respect to which Seller or any ERISA Affiliate has any liability;

(f)    any Liability under any employment, collective bargaining, severance, retention or termination agreement with any employee, independent contractor or contractor (or their representatives) of Seller, except to the extent such Liabilities arise on or after Closing or arise under an Assumed Contract;

(g)    any Liability of Seller to any shareholder or Affiliate of Seller;

(h)    any Liability to indemnify, reimburse or advance amounts to any shareholder, officer, director, employee, or agent of Seller;

(i)    any Liability to distribute to Seller's shareholders or otherwise apply all or any part of the consideration received hereunder;

(j)    any Liability arising out of or resulting from non-compliance with any law, ordinance, regulation, or treaty of any Governmental Authority by Seller;

(k)    any Liability of Seller under this Agreement or any other document executed in connection herewith;

(l)    any Liability of Seller resulting in any way from the Bankruptcy Case;

(m)    any Liability of Seller for Taxes, including any Liability of Seller in respect of any amount of federal, state, or other Taxes (including interest, penalties, and additions to such Taxes) and any Liabilities of Seller for (i) Taxes arising (A) as a result of a Seller at any time being a member of an affiliated group (as defined in Section 1504(a) of the Code) prior to the Closing Date, (B) under any Tax allocation, sharing, indemnity, or similar agreement with any Person that is imposed on or measured

18

by the income of a Seller for any period (other than arising under an Assumed Contract on or after the Closing Date), or (C) as a result of such Seller's operation of the Entire Business or any portion of the Entire Business or ownership of the Acquired Assets on or prior to the Closing; and (ii) any transfer Taxes for which Seller is liable as set forth in Section 8.1; *provided, however,* that Excluded Liabilities shall in no event include Taxes relating to the Acquired Business, Acquired Assets or Acquired Liabilities that arise from the conduct of the Acquired Business, or are otherwise attributable to, periods on or following the Closing Date;

(n)    any Liability arising out of or resulting from actions taken by a Seller prior to Closing related to the shutdown of any of its operations or facilities or the termination of any of its employees or independent contractors including any severance obligations;

(o)    any Liability arising out of the Deferred Compensation Plan Trust;

(p)    any Liability arising out of or related to any violation by Seller of Environmental, Health and Safety Laws;

(q)    any Liability to the Transferred Employees arising prior to the date hereof, other than as explicitly set forth in Section 7.7(d), and Liabilities arising out of the Transferred Employee Plans;

(r)    Liabilities of Seller as debtors-in-possession in the Chapter 11 Cases to the Remainder Employees pursuant to allowed claims under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code;

(s)    Liabilities to the Remainder Employees under Seller's old profit sharing plan payable in the quarter ending March 31, 2013;

(t)    the Determined Cure Costs (including with respect to any Executory Music LOIs, if any), except to the extent of the amounts set forth on Schedule C; and

(u)    all liabilities, rebates, set-offs or other costs, including charges against Accounts Receivable, in connection with and pursuant to the price protection arrangements relating to Channel Inventory described on Schedule 5.20(b).

Buyer and Seller hereby acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement shall not create an Assumed Liability or other Liability of Buyer, except where such disclosed obligation has been expressly assumed by Buyer as an Assumed Liability in accordance with the provisions of Section 2.3.

Section 2.5    Assignments; Determined Cure Costs.  Seller shall transfer and assign all Assumed Contracts to Buyer, and Buyer shall assume all Assumed Contracts from Seller, as of the Closing Date pursuant to the Sale Order.  In connection with such assignment and assumption, Buyer shall cure monetary defaults under such Assumed Contracts (excluding with respect to any Executory Music LOIs, if any), (i) only as and to the extent of the amounts set forth on Schedule C, and (ii) subject to clause (i), to the extent required by Section 365(b) or (f) of the Bankruptcy Code.  In consultation with and at the direction of Buyer, Seller shall file

19

and prosecute any pleadings with the Bankruptcy Court to determine the amount of any asserted Cure Cost. As and when an asserted Cure Cost becomes a Determined Cure Cost, the amount of such Determined Cure Costs (excluding with respect to any Executory Music LOIs, if any) shall be paid by Buyer only as and to the extent of the amounts set forth on Schedule C, and Seller shall be responsible for paying and shall pay any Determined Cure Cost to the extent such cost is in excess of the amounts set forth on Schedule C. In the case of licenses, certificates, approvals, authorizations, Contracts and other commitments included in the Acquired Assets (a) that cannot be transferred or assigned effectively without the consent of third parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, subject to any approval of the Bankruptcy Court that may be required, cooperate with Buyer in all reasonable respects, including by complying with the terms of Section 2.6, to provide to Buyer the benefits thereof in some other manner, or (b) that are otherwise not transferable or assignable (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate, including by complying with the terms of Section 2.6, with Buyer to provide to Buyer the benefits thereof in some other manner (including the exercise of the rights of Seller thereunder).

Section 2.6    Further Actions and Assurances. At the Closing, Seller shall execute and deliver to Buyer such other instruments of transfer as shall be reasonably necessary or appropriate to vest in Buyer good and indefeasible title to the Acquired Assets free and clear of any and all Claims, Encumbrances and Liabilities, except (a) as set forth on Schedule 5.5, (b) for the Assumed Liabilities, (c) for Permitted Encumbrances and (d) any Nonassignable Asset, and to comply with the purposes and intent of this Agreement and such other instruments as shall be reasonably necessary or appropriate to evidence the assignment by Seller and assumption by Buyer of the Assumed Contracts. Each of Seller and Buyer shall use its commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Law, and execute and deliver such documents and other papers, as may be required to consummate the transactions contemplated by this Agreement at or after the Closing, including, subject to Section 2.5, assistance by Seller with the transfer of the Acquired Inventory, Acquired Permits, Acquired Documents, Acquired Intellectual Property (including with respect to making all appropriate filings and submissions with the United States Copyright Office, United States Patent and Trademark Office and any applicable similar agencies in foreign jurisdictions promptly after Closing, and in any event within thirty (30) days of Closing) and Product Registrations that are Acquired Assets. To the extent that any asset related to any Acquired Lot or otherwise to be acquired by Buyer upon the Closing is determined by the Bankruptcy Court to be non-assignable pursuant to section 365(c) of the Bankruptcy Code (each, a "**Nonassignable Asset**"), such Nonassignable Asset shall at Buyer's option (i) excluded from the sale contemplated hereby and the Purchase Price shall be reduced by the amount of the Assumed Liabilities represented by such Nonassignable Asset (provided, that in no event shall the Purchase Price be reduced to an amount less than zero), or (ii) be held, as of and from the Closing Date, for the benefit and burden of the Buyer, and the covenants and obligations thereunder shall be fully performed by Buyer on the relevant Seller's behalf (to the extent such covenants and obligations are Assumed Liabilities), and all rights (to the extent such rights are Acquired Assets) existing thereunder shall be for Buyer's account. To the extent permitted by applicable law, the relevant Seller shall take or cause to be taken, at Buyer's expense, such actions as Buyer may reasonably request which

20

are required to be taken or appropriate in order to provide Buyer with the benefits and burdens of the Nonassignable Asset. The relevant Seller shall promptly pay over to Buyer the net amount (after expenses and Taxes of Seller (after taking into account any Tax benefits arising from such payments)) of all payments received by it in respect of all Nonassignable Assets, other than payments received from Buyer pursuant to this Agreement. In all instances after Closing, if Seller will incur any out-of-pocket costs, other than Cure Costs in excess of those set forth on Schedule C, in complying with its obligations under this Section 2.6, such out-of-pocket costs shall be borne at the direction of Buyer by, or reimbursed to the applicable Seller by, Buyer. Prior to the Closing, the Parties shall cooperate in good faith to identify any assets, properties, rights, titles or interests that may not be able to be conveyed at Closing.

**ARTICLE III**
**PURCHASE PRICE**

Section 3.1    Purchase Price. The purchase price (the "**Purchase Price**") for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Acquired Assets shall consist, subject to adjustment pursuant to the terms of Section 2.6, of the assumption of the Assumed Liabilities.

Section 3.2    <Intentionally Omitted>

Section 3.3    <Intentionally Omitted>

Section 3.4    Discharge of Assumed Liabilities After Closing. From and after the Closing, Buyer shall pay, perform or satisfy the Assumed Liabilities in accordance with their respective terms.

Section 3.5    <Intentionally Omitted>

**ARTICLE IV**
**CLOSING**

Section 4.1    Closing Date. Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "**Closing**") shall take place remotely via the exchange of documents and signatures, no later than the first (1st) Business Day following the date on which the conditions set forth in Article IX and Article X have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or at such other place or time as Buyer and Seller may mutually agree. The date and time at which the Closing actually occurs is referred to as the "**Closing Date**".

Section 4.2    Buyer's Deliveries. At the Closing: Buyer shall deliver to Seller:

(a)    the Assumption Agreement;

(b)    each other Transaction Document to which Buyer is a party, duly executed

21

by Buyer;

(c)     the certificates of Buyer to be received by Seller pursuant to Sections 10.1 and 10.2; and

(d)     such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Acquired Assets and Assumed Liabilities to Buyer.

Section 4.3     Seller's Deliveries.  At the Closing, Seller shall deliver to Buyer:

(a)     the Assumption Agreement, and each other Transaction Document to which Seller is a party, duly executed by each applicable Seller;

(b)     instruments of assignment of the Acquired Patents (the "**Assignment of Patents**"), Acquired Trademarks (the "**Assignment of Trademarks**"), Acquired Copyrights (the "**Assignment of Copyrights**"), and Acquired Domain Names (the "**Assignment of Domain Names**") and, as necessary, any other Acquired Intellectual Property, if any, duly executed by Seller in a form appropriate for recordation with the appropriate Governmental Authorities in the form of Exhibits 4.3(a) through 4.3(d), respectively;

(c)     a certified copy of the Sale Order entered by the Bankruptcy Court;

(d)     the certificates of Seller to be received by Buyer pursuant to Sections 9.1 and 9.2;

(e)     a certificate of non-foreign status executed by Seller (or, if applicable, a direct or indirect owner of a Seller) that is not a disregarded entity for U.S. federal income tax purposes, prepared in accordance with Treasury Regulation Section 1.1445-2(b);

(f)     a schedule, certified by an executive officer of Seller, setting forth (i) IT contact information for assistance with Acquired Asset retrieval following the closing, (ii) the amount of data, information and other "soft" Intellectual Property that constitutes part of the Acquired Assets, and (iii) Seller's preferred method for migration of the data, information and other "soft" Intellectual Property set forth in clause (ii) above; and

(g)     such other bills of sale, special warranty deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Seller in, to or under any or all the Acquired Assets.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the corresponding sections or subsections of the Schedules attached hereto, Seller hereby represents and warrants to Buyer on the Execution Date (or such other date, to the extent expressly specified) that the statements contained in this Article V are true and correct:

Section 5.1    Organization and Good Standing.    Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. Seller has the requisite corporate or other power and authority to own or lease and to operate and use its properties and to carry on the Acquired Business as now conducted. Except as set forth on Schedule 5.1, Seller is duly qualified or licensed to do business and in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

Section 5.2    Authority; Validity; Consents.    Subject to entry of the Sale Order, Seller has the requisite corporate or other power and authority necessary to enter into and perform their respective obligations under this Agreement and the other Transaction Documents to which Seller is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Seller and the consummation by Seller of the transactions contemplated herein have been duly and validly authorized by all requisite corporate or other actions in respect thereof. This Agreement has been duly and validly executed and delivered by Seller and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by the requisite Seller at the Closing. Subject to entry of the Sale Order, this Agreement and the other Transaction Documents constitute, with respect to Seller, the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms. Subject to requisite Bankruptcy Court approval, except (a) for entry of the Sale Order and (b) for notices, filings and consents required  (i) in connection with the Bankruptcy Case or (ii) pursuant to the HSR Act or similar Laws of foreign jurisdictions, Seller is not and will not be required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except for (i) such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, have a Material Adverse Effect, and (ii) the consent of third parties, if any, required for the assignment of any Assumed Contract or Assumed Lease, the failure of which to provide, make or obtain, would not, individually or in the aggregate, have a Material Adverse Effect.

Section 5.3    No Conflict.    Except as may be required pursuant to the HSR Act or similar Laws of foreign jurisdictions, when the consents and other actions described in Section 5.2 have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein do not and will not conflict with or result in the material breach of any of the terms and provisions of, or constitute a material default under, or materially conflict with, or require

23

consent or the giving of notice under, or cause any acceleration of any material obligation of Seller under (a) the organizational documents of Seller, (b) any Order or (c) any Law.

Section 5.4     Environmental and Health and Safety Matters. Except as set forth on Schedule 5.4:

(a)     To Seller's Knowledge, the current operations of the Acquired Business comply in all material respects with all applicable Laws concerning environmental, health or safety matters ("**Environmental, Health and Safety Laws**"), and Seller has not received written notice alleging that the activities of the Acquired Business are in violation of any Environmental Health and Safety Laws; and

(b)     To Seller's Knowledge, there has been no Release of any Hazardous Substances at, on or under any of the Real Property, and, to Seller's Knowledge, none of such properties has been used by any Person as a landfill or storage, treatment or disposal site for any type of Hazardous Substance or non-hazardous solid wastes as defined under the Resource Conservation and Recovery Act of 1976, as amended.

Section 5.5     Title to Acquired Assets. Seller has good and valid title to all of the Acquired Assets. Upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and subject to the terms of the Sale Order, Seller will thereby transfer to Buyer, all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Claims, Encumbrances and Liabilities, except (a) as set forth on Schedule 5.5, (b) for the Assumed Liabilities, (c) for Permitted Encumbrances and (d) Nonassignable Assets, and any claim or right or benefit arising thereunder or resulting therefrom, may require consent of a third party or Governmental Authority (each, a "**Transfer Consent**"), which has not been obtained.

Section 5.6     Taxes.

Except as set forth on Schedule 5.6, as would not result in a liability to Buyer:

(i)     all income and other material Tax Returns required to be filed by Seller with respect to the Acquired Business have been timely filed (taking into account any extension of time to file granted, or to be obtained with respect thereto), and all such Tax Returns are complete and accurate in all material respects; (ii) to the Knowledge of Seller, on the Execution Date no examination by any Governmental Authority of any such Tax Return is currently in progress; (iii) to the Knowledge of Seller, no material Tax deficiencies relating to the Acquired Business are being claimed, proposed or assessed in writing by any Governmental Authority against Seller; and (iv) all material amounts of Tax that are due and payable by Seller (whether or not shown on any Tax Return) with respect to the Acquired Business have been duly and timely paid;

(ii)     there are no Encumbrances for Taxes upon any of the Acquired Assets, other than Permitted Encumbrances and, to the Knowledge of Seller, no taxing authority is in the process of imposing any Encumbrances for Taxes on any of the Acquired Assets (other than for current Taxes not yet delinquent); and

24

(iii)    no Seller is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

Section 5.7    Legal Proceedings. As of the date hereof, except for the Bankruptcy Case and as set forth on Schedule 5.7, there is no Proceeding or Order pending, outstanding or, to Seller's Knowledge, threatened against Seller that (a) seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or (b) would have, individually or in the aggregate, a Material Adverse Effect, or a Material Adverse Effect on the ability of Seller to consummate the transactions contemplated by this Agreement.

Section 5.8    Compliance with Laws; Acquired Permits. Except as set forth in Schedule 5.8, Seller is not and has not been in violation in any material respect of the Privacy Policy and/or any Law applicable to the operation of the Acquired Business and hold all material Permits required for Seller to conduct the Acquired Business as it is currently conducted. Except as set forth in Schedule 5.8, there are no Proceedings pending, or to Seller's Knowledge threatened, regarding any of the Permits. Seller is in compliance with the terms of all material Permits in all material respects.

Section 5.9    Intellectual Property.

(a)    The Intellectual Property Identified on Schedule 5.9(a) collectively constitutes all (i) Patent Rights, (ii) Copyright registrations and applications, (iii) Software, (iv) Trademark registrations and applications, (v) material common law Trademarks, and (vi) Domain Names, in each case that are Primarily Related to the Acquired Business. For each of the foregoing items, Schedule 5.9(a) also identifies the name of the record owner of the applicable patent, registration or application or Domain Name.

(b)    Seller owns exclusively all right, title, and interest in, or otherwise holds valid licenses to, all material Acquired Intellectual Property, *provided*, that (i) for each such license, that license grants rights, including the right to sublicense, to such material Acquired Intellectual Property sufficient in the aggregate with the other Acquired Assets to operate the Acquired Business, and (ii) except as set forth on Schedule 5.9(b), such Acquired Intellectual Property is free and clear of any and all Encumbrances (other than (x) Encumbrances that will be removed at or prior to the Closing and (y) restrictions or limitations pursuant to written nonexclusive license agreements entered into in the Ordinary Course of Business). Each written contract, license, permission or other agreement pursuant to which Seller or any of its Affiliates is granted any license or other right to use any Acquired Intellectual Property the loss of which would have a Material Adverse Effect is Identified on Schedule 5.9(b) (the "**Inbound License Agreements**").

(c)    To Seller's Knowledge, the Acquired Intellectual Property is valid and enforceable. Within the past three (3) years, none of the Acquired Intellectual Property has been or is the subject of (i) any pending or, to Seller's Knowledge, threatened adverse claim, judgment, injunction, order, decree or agreement restricting its use in connection with any of the Products (ii) any order that restricts or impairs the use of any Acquired

25

Intellectual Property, (iii) except as noted on Schedule 5.9(c), any threatened litigation or claim of infringement, or (iv) except as set forth on Schedule 5.9(c), challenging Seller's ownership or use, or the validity or enforceability, of any Acquired Intellectual Property.

(d)     To Seller's Knowledge, none of the Acquired Intellectual Property has been used, disclosed or appropriated to the detriment of the Acquired Business for the benefit of any Person other than Seller. To Seller's Knowledge, the Acquired Intellectual Property contains no misappropriated trade secrets or other confidential information of any other Person, unless pursuant to a valid agreement.

Section 5.10     Assumed Contracts. Each Assumed Contract is in full force and effect and is a valid and binding obligation of Seller and, to Seller's Knowledge, the other parties thereto, in accordance with its terms and conditions, in each case except (a) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, and (b) as set forth on Schedule 5.10. The copies of all Assumed Contracts made available to Buyer or its Affiliates are correct and complete. Upon entry of the Sale Order, payment of the Determined Cure Costs, as applicable, and receipt of Transfer Consents (if any), and except as set forth on Schedule 5.10, (i) no Seller will be in material breach or default of its obligations under any such Assumed Contract, (ii) no condition exists that with notice or lapse of time or both would constitute a material default by Seller under any such Assumed Contract, (iii) to Seller's Knowledge, no other party to any such Assumed Contract is in material breach or default thereunder and (iv) each such Assumed Contract may be enforced by Buyer against the other party thereto in accordance with its terms.

Section 5.11     Brokers or Finders. Except as set forth on Schedule 5.11 hereof, Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable, and Seller shall indemnify, defend and hold harmless Buyer from any claims with respect to any such fees or commissions, irrespective of whether such items are set forth on Schedule 5.11.

Section 5.12     Affiliate Transactions. Other than as set forth on Schedule 5.12 hereof or as otherwise expressly contemplated by this Agreement, there are no loans, leases or other continuing transactions between Seller, on the one hand, and any present or former member, manager, stockholder, director or officer of Seller, as applicable, on the other hand, that will be included in the Assumed Liabilities or the Assumed Assets.

Section 5.13     Insurance. The physical properties, assets, business, operations, employees, officers, directors and managers of Seller is insured to the extent disclosed in Schedule 5.13 and (i) there is no claim by Seller pending under any such policies as to which coverage has been questioned, denied or disputed by the insurer, (ii) such insurance policies and arrangements are in full force and effect, all premiums with respect thereto are currently paid, and Seller is in compliance in all material respects with the terms thereof, and (iii) no notice of cancellation or termination has been received by Seller with respect to any insurance policy described in Schedule 5.13.

Section 5.14    Financial Statements.  Schedule 5.14 sets forth the (i) audited consolidated financial statements of Seller as at and for the years ended March 31, 2010, March 31, 2011 and March 31, 2012 (the "**Audited Financial Statements**") and (ii) audited consolidated financial statements of the Entire Business as at and for the period ended September 30, 2012 (the "**Interim Financial Statements**"), including in each of clauses (i) and (ii) a balance sheet, statement of income and statements of cash flows and operations and for clause (i) a statement of retained earnings (the Audited Financial Statements and the Interim Financial Statements collectively, the "**Financial Statements**").  The Financial Statements have been prepared in accordance with United States generally accepted accounting principles and practices in effect from time to time applied on a consistent basis throughout the periods indicated and present fairly, in all material respects, the financial condition of Seller at their respective dates, *provided, however*, that the financial statements were prepared on a going concern basis.

Section 5.15    Assets Necessary to Business.

(a)    Except as set forth on Schedule 5.15, the Acquired Assets constitute all of Seller's assets, properties, licenses and Contracts that are being used on the date hereof that are Primarily Related to the Acquired Business as conducted on the date hereof or the Products Identified on Schedule 1.1(c).  None of the Excluded Assets (other than the Shared Assets and Liabilities) as of the Execution Date is necessary in any material respect to conduct the Acquired Business in substantially the same manner as the Acquired Business has been conducted prior to the date hereof.

(b)    Schedule C sets forth a complete and accurate list of (i) all material Contracts that are Primarily Related to the Acquired Business and (ii) all Contracts that Are Primarily Related to the Products Identified on Schedule 1.1(c), and, in each case, the Cure Costs associated with each such Contract.

(c)    None of the Excluded IT Systems are Primarily Related to the Acquired Lot.

Section 5.16    Employee Benefits.  Schedule 5.16 sets forth:

(a)    Each Benefit Plan, copies or descriptions of which have been made available to Buyer or its Affiliates.

(b)    Each material plan or arrangement not subject to ERISA maintained or otherwise contributed to by Seller providing for deferred compensation, bonuses, equity compensation, employee insurance coverage or any similar material compensation or welfare benefit arrangement (collectively, the "**Benefit Arrangements**"), copies or descriptions of which have been made available to Buyer or its Affiliates.

(c)    Except as set forth on Schedule 5.16, each Benefit Plan and Benefit Arrangement has, to the Knowledge of Seller, been maintained and administered at all times in compliance in all material respects with its terms and all applicable laws, including ERISA and the Code, applicable to such Benefit Plan or Benefit Arrangement.

27

Each Benefit Plan and Benefit Arrangement subject to Section 409A of the Code has complied, in all material respects, with the provisions of Section 409A of the Code and the IRS guidance issued thereunder.

(d)    Each Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the IRS with respect to such qualified status. No Benefit Plan is subject to Section 412 of the Code or Title IV of ERISA.

Section 5.17    Subsidiaries. Except as set forth on Schedule 5.17, neither Seller nor any of their Subsidiaries owns, directly or indirectly, any stock, partnership interest, limited liability company interest, joint venture interest or other security or interest in any other Person.

Section 5.18    No Changes.

(a)    Except as set forth in Schedule 5.18 and pursuant to the Friendco Purchase Agreements, since March 31, 2012: (i) Seller has not sold, leased, transferred, or assigned any of the assets used in the Entire Business or the portion of the Entire Business that constitutes the Acquired Business, tangible or intangible, other than for fair consideration in the Ordinary Course of Business; (ii) Seller has neither entered into nor terminated any agreement, contract, lease or license (or series of related agreements, contracts, leases and licenses pertaining to the Entire Business or a portion of the Entire Business) involving more than $100,000 and outside the Ordinary Course of Business; (iii) Seller has not made any capital expenditures (or series of related capital expenditures) with respect to the Entire Business or the portion of the Entire Business that constitutes the Acquired Business involving more than $100,000 and outside the Ordinary Course of Business; and (iv) Seller has not experienced any damage, destruction or loss (whether or not covered by insurance) to their properties or other assets included in the Acquired Assets.

(b)    From and after December 19, 2012, Seller has not sold, licensed, leased, transferred or otherwise provided any third party access to the Products Identified on Schedule 1.1(c), including the Acquired Inventory, except in the Ordinary Course of Business.

Section 5.19    Schedule B; Cure List. Schedule B Identifies a list as of the date hereof of all Contracts or Contract counterparties Primarily Related to the Acquired Business having, in Seller's good faith estimation, Cure Costs in excess of $10,000, which list shall include Seller's good faith estimate of the Cure Costs in respect of each such Contract or counterparty (the "**Cure List**").

Section 5.20    Channel Inventory and Acquired Inventory.

(a)    Schedule 5.20(a) sets forth, as of January 19, 2013, for North America (i) the amount of Inventory that has been sold into the retail channel (together with the Europe Channel Inventory, the "**Channel Inventory**"), categorized by Product and

retailer, and (ii) the amount of Acquired Inventory, categorized by Product.

(b)    Schedule 5.20(b) sets forth (i) a description of any existing price protection agreements, plans or processes relating to the Channel Inventory and (ii) a description of any other material obligations of Seller in respect of the Channel Inventory.

(c)    The schedule to be provided pursuant to Section 7.5 sets forth, as of January 19, 2013 or a later date, for Europe (i) the amount of Inventory that has been sold into or sold through the retail channel (the "**Europe Channel Inventory**"), categorized by Product and retailer, and (ii) the amount of Acquired Inventory, categorized by Product.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller on the Execution Date that the statements contained in this Article VI are true and correct:

Section 6.1    Organization and Good Standing.  Buyer is a corporation, duly organized, validly existing and in good standing under the laws of Delaware.

Section 6.2    Authority; Validity; Consents.  Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite corporate actions in respect thereof.  This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party will be duly and validly executed and delivered by Buyer at the Closing.  This Agreement and the other Transaction Documents to which Buyer is a party will, when duly executed by the other parties hereto and thereto, if any, constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.  Except as may be required pursuant to the HSR Act or similar Laws of foreign jurisdictions, Buyer is not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby or thereby.

Section 6.3    No Conflict.  Except as may be required pursuant to the HSR Act or similar Laws of foreign jurisdictions, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which it is bound, (b) the organizational

29

documents of Buyer, (c) any Order or (d) any Law.

Section 6.4      Brokers or Finders.  Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable, and Buyer shall hold harmless and indemnify Seller from any claims with respect to any such fees or commissions.

**ARTICLE VII**
**COVENANTS**

Section 7.1      Access to the Acquired Business; Interim Deliveries.

(a)      Seller Access. After the Execution Date and prior to the Closing Date, Seller shall, at Buyer's sole cost and expense and in accordance with reasonable procedures to be established in good faith by mutual agreement of Seller's Interim Access Manager and Buyer's Interim Access Manager, (a) afford Buyer's authorized Representatives access during normal business hours to the offices, properties, key employees, outside accountants, agreements and other documentation and financial records (including computer files, retrieval programs and similar documentation) with respect to the Acquired Business to the extent Buyer reasonably deems necessary, and permit Buyer and its authorized Representatives to make copies of such materials, (b) furnish to Buyer or its authorized Representatives such additional information concerning the Acquired Business or the Acquired Assets as shall be reasonably requested by Buyer or its authorized Representatives and (c) use commercially reasonable efforts to cause their outside accountants and outside counsel to cooperate with Buyer in its investigation; *provided, however,* that Buyer shall submit to Seller requests for such access, information or cooperation, including reasonable detail regarding the requested access, information or cooperation, a reasonable period in advance of the time at which such access, information or cooperation is to be provided, and all such requests shall be submitted only to Jason Kay or Edward L. Kaufman, as Seller's designated representative, or to such other individuals as Seller may designate from time to time to receive such requests ("**Seller's Interim Access Manager**"). Such requests of Buyer shall be submitted only by David Ismailer or Steve Lux or another individual reasonably acceptable to Seller's Interim Access Manager as successor, as Buyer's designated representative ("**Buyer's Interim Access Manager**"). Notwithstanding anything herein to the contrary, no such access, information or cooperation shall be permitted or required to the extent that it would require Seller to disclose information subject to attorney-client privilege or would be prohibited by Law or would otherwise contravene any antitrust or competition Law.

(b)      Employees and Equipment. After the Execution Date and prior to the Closing Date, Seller shall, at Buyer's sole cost and expense and in accordance with reasonable procedures to be established in good faith by mutual agreement of Seller's Interim Access Manager and Buyer's Interim Access Manager, (a) afford Buyer's authorized Representatives access during normal business hours to the offices with respect to the Acquired Business and the Current Business Employees to the extent Buyer reasonably deems necessary, (b) permit Buyer and its authorized Representatives to

move, at Buyer's own cost, the Acquired Equipment, the Acquired Documents and the Acquired IT Systems (the "**Interim Deliveries**") to a premises of Buyer, to be held and used by Buyer solely in connection with the operation of the Acquired Business, pending the consummation of the transactions contemplated hereby at the Closing, and (c) permit Buyer to control and direct the Current Business Employees with respect to the operation of the Acquired Business.

Section 7.2    Operations Prior to the Closing Date.

Seller covenants and agrees that, except (i) as expressly contemplated by this Agreement, (ii) as disclosed in Schedule 7.2 or any other Schedule as of the date hereof, (iii) with the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), (iv) as required by, arising out of, relating to or resulting from the Bankruptcy Case or otherwise approved by the Bankruptcy Court and (v) as otherwise required by Laws, after the Execution Date and prior to the Closing Date:

(a)    Seller shall use commercially reasonable efforts, taking into account Seller's status as a debtor-in-possession in the Bankruptcy Case, to carry on in the Ordinary Course of Business (including by paying all fees due to any regulatory authority in the Ordinary Course of Business), to maintain in full force and effect the Acquired Permits, to maintain and preserve the Acquired Assets in their present condition, reasonable wear and tear excepted, and to keep intact the business relationships relating to the Acquired Assets; and, without limiting the generality of the forgoing,

(b)    Seller shall not:

(i)    other than pursuant to any debtor-in-possession financing or cash collateral agreement or order, sell, lease (as lessor), mortgage or pledge, or voluntarily impose or suffer to be imposed, any Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) on any Acquired Asset;

(ii)    issue, deliver or sell or authorize the issuance, delivery or sale of, any shares of capital stock or membership or other equity interests of Seller;

(iii)    fail to pay any maintenance or similar fees in connection with the prosecution and maintenance of Acquired Intellectual Property, or otherwise fail to protect and maintain Acquired Intellectual Property consistent with past practice in any material respect;

(iv)    amend any of the Contracts or Leases other than non-material amendments made in the Ordinary Course of Business;

(v)    other than in the Ordinary Course of Business, enter into any new, or amend any existing, license or other similar agreement concerning any Acquired Intellectual Property;

(vi)    except in the Ordinary Course of Business, cancel or compromise any Claim or waive or release any right, in each case, that is a Claim or right related to an Acquired Asset;

31

(vii)    except in the Ordinary Course of Business, sell, license, lease, transfer or otherwise provide any third party access to the Products Identified on Schedule 1.1(c), including the Acquired Inventory; or

(viii)    enter into any agreement or commitment to take any action prohibited by this Section 7.2.

Section 7.3        Reasonable Efforts.

(a)    Seller and Buyer shall use all reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using best efforts to accomplish the following: (i) the taking of all reasonable acts necessary to cause the conditions precedent set forth in Article IX and Article X to be satisfied, (ii) the obtaining of all necessary consents and approvals of any Governmental Authority and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all steps as may be necessary to avoid any Proceeding by any Governmental Authority, (iii) the defending of any Proceedings challenging this Agreement or the consummation of the transaction contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed, and (iv) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the intents and purposes of this Agreement.

(b)    Seller and Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto and shall discuss and attempt to reasonably account for any comments or suggestions of the other Party. In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent not prohibited by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, Buyer and Seller shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. In carrying out their obligations under this Section 7.3, subject to applicable Law, each of the Parties shall not

32

submit or otherwise provide any information to such Governmental Authority without first having provided a reasonable opportunity to the other Party and its counsel to comment upon such information.  Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.  Any Party may, as it deems advisable and necessary, reasonably designate any sensitive material provided to the other Party under this Section 7.3, or otherwise pursuant to this Agreement, as "outside counsel only."  Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to the directors, officers or employees of the recipient, unless express written permission is obtained in advance from the source of the materials.

(c)     Neither Buyer nor Seller shall, after the entry of the Sale Order, enter into any agreement that would have the effect of delaying the consummation of any action contemplated by this Agreement without the written consent of the other Party.

(d)     Neither Buyer nor any of its controlled Affiliates shall take any action or acquire any assets or securities of any other Person or agree to acquire assets or securities of any other Person if such action, acquisition or agreement would reasonably be expected to materially impair Buyer's ability to consummate the transactions contemplated hereby.

Section 7.4     Bankruptcy Court Filings and Approval.

(a)     Seller has filed with the Bankruptcy Court, on February 12, 2013, the Sale Motion.

(b)     <Intentionally omitted>.

(c)     Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and, consistent with Section 8.3(a) below, a finding by the Bankruptcy Court of adequate assurance of future performance by Buyer.

(d)     Seller and Buyer acknowledge that this Agreement and the sale of the Acquired Assets and the assumption and assignment of the Assumed Contracts are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate in the exercise of Seller's business judgment that the transactions contemplated by this Agreement will provide a greater consideration for the Debtors estates than would be provided by any other available alternative, including a public marketing or auction process for the Acquired Assets and (ii) Buyer must provide adequate assurance of future performance under the Assumed Contracts to be assigned by Seller.

(e)     Seller shall give appropriate notice, and provide appropriate opportunity

33

for hearing, to all Persons entitled thereto, of all motions, orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.

(f)     In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Seller shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from or stay request in respect of either of such orders. Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal or stay request and obtain an expedited resolution of such appeal.

(g)     After entry of the Sale Order, Seller shall not take any action that is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

Section 7.5     <u>Europe Channel Inventory</u>. Prior to the Closing, Seller shall deliver to Buyer a schedule setting forth, as of January 19, 2013 or a later date, for Europe, (i) the amount of Inventory that has been sold into or sold through the retail channel, categorized by Product and retailer, and (ii) the amount of Acquired Inventory, categorized by Product.

Section 7.6     <u>Communications with Customers and Suppliers</u>. Prior to the Closing, Buyer and its Affiliates and Representatives may contact, or engage in any discussions or otherwise communicate with, any of Seller's landlords, employees, clients, suppliers and other Persons with which Seller has commercial dealings and that are Primarily Related to the Acquired Business with the prior consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed. Nothing herein shall in any way restrict or limit Buyer or its Affiliates from contacting, or engaging in discussions or otherwise communicating with, any Person in the ordinary course of the business of Buyer and its Affiliates as conducted on or prior to the date hereof.

Section 7.7     <u>Employee Matters</u>.

(a)     Seller has provided (or, with respect to clause (vi), prior to the Closing Seller shall provide) Buyer with a list of all Business Employees and, to the extent such information is permitted to be disclosed under applicable law:  (i) title or job/position, (ii) job designation (i.e., salaried or hourly), (iii) location of employment and Seller employer, (iv) employment status (active, on leave, on unpaid leave, or no longer employed by Seller as of the date hereof), (v) amount of unused vacation and paid time off accrued by each such Business Employee through and as of February 19, 2013, (vi) copies of the personnel files (including performance reviews and salary and bonus history) for each member of the Fight Team (as defined below), and (vii) annual base rate of compensation for all salaried employees and any bonus amount that he or she has received for the fiscal years ended March 31, 2012 and March 31, 2011.

(b)     Buyer has provided Seller with a list of those Business Employees who

34

have been offered employment by Buyer or a Subsidiary of Buyer (the "**Fight Team**"), as described in greater detail in Section 7.7(c). Seller shall not preclude Buyer from offering employment or a consulting relationship to any Business Employee or solicit any such Business Employee to refuse such offer of employment or a consulting relationship.

(c)    Prior to the date hereof, Buyer has provided (or caused one of its Subsidiaries to provide) to each member of the Fight Team an offer of employment effective as of the Closing Date and contingent upon the occurrence of the Closing (the "**Employment Offer**"), each on terms (with respects to wage level and benefits) that are either, at the sole discretion of Buyer: (a) substantially similar in the aggregate to the terms such Business Employee was subject to prior to the date hereof or (b) substantially similar in the aggregate to the terms (with respects to wage level and benefits) of employment of other similarly situated employees of Buyer as of the Closing Date. Each Business Employee who accepts Buyer's offer of employment and who becomes an employee of Buyer or of one of its Subsidiaries shall be a "**Transferred Employee**". Seller shall cooperate with Buyer in effecting the Transferred Employees' transfer of employment from Seller to Buyer or a Buyer Subsidiary as contemplated hereby.

(d)    Unless prohibited by Law or otherwise provided for in an Employment Offer, all unused vacation and paid time off of the Transferred Employees accrued as of the Closing Date shall, effective as of the Closing Date or, if later, the date on which such Transferred Employee becomes an employee of Buyer, be transferred to and assumed by Buyer.

(e)    From and after the Closing Date, Seller shall retain all (i) employment obligations with regard to all employees and former employees of Seller (or who are otherwise related to the Entire Business) who are not Transferred Employees, and (ii) any liabilities related to any Transferred Employees to the extent not expressly assumed by Buyer in Section 2.3(f).

(f)    Seller agrees to use its commercially reasonable efforts to maintain the employment of all Business Employees employed by Seller as of the date hereof (the "**Current Business Employees**"), on substantially similar terms as in effect as of December 19, 2012 or immediately prior to the date hereof, from the date hereof to and through the Closing, including the Fight Team. From the date hereof to and through the Closing (or the termination of this Agreement pursuant to Section 11.1), Seller agrees (i) to provide all Current Business Employees, including the Fight Team, reasonable access in the Ordinary Course of Business (x) during normal business hours on the date hereof and (y) during normal business hours upon reasonable advance notice on any day after the date hereof, in each case to all properties and resources of Seller such Current Business Employees had access to as of December 19, 2012 or immediately prior to the date hereof, and (ii) that Buyer shall have the right to control and direct the Current Business Employees with respect to the operation of the Acquired Business.

(g)    Notwithstanding anything to the contrary in Section 2.4 and subject to the satisfaction or waiver of the conditions set forth in Article IX and the successful consummation of the transactions contemplated hereby at the Closing, Buyer agrees to

reimburse Seller within five Business Days following the Closing for all reasonably invoiced or documented out-of-pocket salary expenses and other employee benefit expenses of the Fight Team, up to $40,000 per week (the "**Fight Team Expenses**") from January 25, 2013 through the Closing.

(h)    Without limitation of Section 12.10, nothing in this Section 7.7 shall (a) be treated as an amendment of, or undertaking to amend, any Benefit Plan, (b) obligate Buyer, Seller or any of its respective Affiliates to retain the employment of any particular employee, or (c) confer any rights or benefits on any person, including any employee of Seller, other than the Parties to this Agreement.

Section 7.8        Shared Lot; Shared Assets and Liabilities.

(a)    Schedules Other Than Schedule B.  Any item identified on a Schedule (other than Schedule B) as corresponding to the Shared Lot may also include a parenthetical or similar designation designating which Lots such item is shared among; *provided, however,* that if such item has no such parenthetical designation, such item shall be deemed shared among every Lot.

(b)    Schedule B.  Any item identified on Schedule B as corresponding to more than one Lot (including through the presence of the number "1" in the appropriate Lot column), shall be deemed to be designated as corresponding to the Shared Lot, and deemed shared among such identified Lots; *provided, however,* that if such item has no such identification, such item shall be deemed as corresponding to the Estate Lot.

(c)    Pre-Closing Allocation of Shared Assets and Liabilities.  The Seller and Buyer shall negotiate in good faith with one another to review the assets and liabilities set forth in the Schedules and may, upon mutual agreement, update or amend the Schedules to reallocate assets and liabilities to a different Lot at any time prior to the Closing.

(d)    Post-Closing Further Assurances and Good Faith Efforts.  With respect to any Shared Assets and Liabilities, Seller and Buyer hereby covenant to negotiate in good faith with one another regarding the shared use of such Shared Assets and Liabilities, including through any one or more of the following: (i) the assignment by Seller of any such Shared Assets and Liabilities to (and the assumption of such Shared Assets and Liabilities by) Buyer; (ii) the use by Buyer of such Shared Assets and Liabilities; and (iii) any other reasonable means of providing the Buyer the benefits and for Buyer to assume the obligations under such Shared Assets and Liabilities; *provided, however,* that nothing set forth in this Section 7.8(d) shall prevent Seller from rejecting a Contract in accordance with Section 365(a) of the Bankruptcy Code.

(e)    Inapplicable Shared Lot.  For purposes of clarity, the foregoing Sections 7.8(c) and 7.8(d) shall not apply with respect to any assets, properties, rights and liabilities of Seller that are identified on any Schedule as corresponding to the Shared Lot but that are not shared among at least one Acquired Lot

(f)    Other Acquirers.  Seller shall negotiate in good faith with any other Person with interest in the Shared Assets and Liabilities, including any Person who has acquired

any assets or assumed any liabilities of Seller or its Affiliates in connection with the Chapter 11 Cases (collectively, the "**Other Acquirers**") regarding the shared use of such Shared Assets and Liabilities, including through one or more of the following: (i) the assignment by Seller of any such Shared Assets and Liabilities to (and the assumption of such Shared Assets and Liabilities by) Buyer or one or more Other Acquirers, accompanied by a Contract among Buyer and the Other Acquirers, in form and substance agreeable to Seller, Buyer and such Other Acquirers; (ii) the joint use by Buyer and the applicable Other Acquirers of such Shared Assets and Liabilities; and (iii) any other reasonable means of providing the Buyer and the Other Acquirers the benefits and for such Persons to assume the obligations under such Shared Assets and Liabilities. Seller shall use commercially reasonable efforts to facilitate negotiations between Buyer and the Other Acquirers in connection with, and with joint use of, the Shared Assets and Liabilities.

(g)     Shared Domain Names. With respect to Domain Names that are identified as corresponding to the Shared Lot (the "**Shared Domain Names**"), after the Closing, Seller will direct the URLs and/or subdomain names (i) within the Shared Domain Names that are Primarily Related to the Acquired Lot or (ii) that are set forth on Schedule 7.8(g) (the "**Subdomain Names**"), to the DNS servers or landing pages identified by Buyer. As of the date that Seller completes the plan of reorganization in the Bankruptcy Case, including the liquidation of any remaining assets (the "**Reorganization Completion**"), the Shared Domain Names may be assigned to Buyer, Friendco or a Third Party; *provided, however*, that such assignee agrees to (1) assume Seller's obligations to direct (x) the Subdomain Names to the DNS servers or landing pages identified by Buyer and (y) any other URLs or subdomain names within the Shared Domain Names to the DNS servers or landing pages identified by the applicable Friendco and (2) pay the reasonable costs to maintain and host the Shared Domain Names, to the extent such Shared Domain Names continue to be used in a manner reasonably consistent with historical practice by Buyer or the applicable Friendco. In any event, following the date hereof through the Reorganization Completion, Buyer shall pay (together with any applicable Friendco sharing in such Shared Domain Name) the reasonable costs to maintain and host the applicable Shared Domain Names.

(h)     "**Shared Assets and Liabilities**" means any assets, properties, rights and liabilities of Seller that are either (i) identified on any Schedule as corresponding to the Shared Lot and being shared among at least one Acquired Lot or (ii) Unscheduled Shared Assets and Liabilities.

(i)     "**Specified Excluded Assets and Liabilities**" means any assets, properties, rights and liabilities explicitly described in Section 2.2 (other than Sections 2.2(c), 2.2(g) and 2.2(n)).

(j)     "**Unscheduled Shared Assets and Liabilities**" means any assets, properties, rights and liabilities of Seller that (a) are not Identified or Excluded on any Schedule, (b) are not Primarily Related to either (i) the Products of any single Excluded Lot or (ii) the Products, assets, properties, rights or liabilities of the Estate Lot, (c) are not

Specified Excluded Assets and Liabilities, (d) are Related to the Acquired Business, and (e) are Related to the Excluded Business.

Section 7.9     Updates to Schedule C.  At any time and from time to time between the date hereof and the Closing Date, Buyer may, in its sole discretion, add to Schedule C any Contract listed on Schedule A-9 (an "**Added Contract**"), and such updated Schedule C shall become Schedule C for all purposes hereunder; *provided, however*, that the Cure Cost with respect to such Added Contract shall equal (a) the amount set forth on Schedule C (if any) following addition of the Added Contract to such Schedule, (b) if no Cure Cost for such Added Contract is set forth on Schedule C, the amount of Cure Cost to be set forth on Schedule C for such Added Contract shall be the Cure Cost set forth on Schedule B (if any), and (c) if no Cure Cost for such Added Contract is set forth on Schedule B or Schedule C, then Seller and Buyer shall cooperate in good faith to mutually agree on the Cure Cost to be set forth on Schedule C for such Added Contract; *provided, further*, that such Added Contract and the related Cure Cost shall remain subject to Section 2.5.

**ARTICLE VIII**
**ADDITIONAL AGREEMENTS**

Section 8.1     Taxes.

(a)     Any sales, use, property transfer or gains, documentary, stamp, registration, recording or similar Tax (including, for certainty, goods and services tax, harmonized sales tax and land transfer tax) payable solely as a result of the sale or transfer of the Acquired Assets pursuant to this Agreement ("**Transfer Taxes**") shall (to the extent not subject to an exemption under the Bankruptcy Code) be borne by Seller. Seller and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes.  Buyer and Seller shall cooperate to prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes.

(b)     Buyer and Seller agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information, documents and assistance relating to the Acquired Business and the Acquired Assets as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claims, suit or proceeding relating to any Tax; *provided, however*, that neither Buyer nor Seller shall be required to disclose the contents of its income tax returns to any Person.  Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(b) shall be borne by the Party requesting it.

(c)     Notwithstanding any other provisions in this Agreement, Buyer and Seller hereby waive compliance with all "bulk sales," "bulk transfer" and similar laws that may be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

(d)     Buyer shall not make or permit its Affiliates to make any Tax-related

38

elections with respect to the Acquired Assets (including, if there is any Acquired Subsidiary, any election under Section 338 of the Code) that could have an adverse impact on Seller without the advance written consent of Seller.

Section 8.2    Payments Received. Seller and Buyer each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other (or their assignee or designee), from time to time as and when received by them, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing that properly belongs to the other (or their assignee or designee) and will account to the other (or their assignee or designee) for all such receipts.

Section 8.3    Assumed Contracts; Adequate Assurance of Future Performance.

(a)    Buyer and Seller agree that they will promptly take all actions reasonably required to provide the evidence required to establish that Buyer can provide adequate assurance of future performance under the Assumed Contracts, including such affidavits, non-confidential financial information and other documents or information as may be necessary or desirable for filing with the Bankruptcy Court and making Buyer's and Seller's Representatives available to testify before the Bankruptcy Court.

(b)    Subject to the other terms and conditions of this Agreement, Buyer shall, from and after the Closing Date, (i) assume all Liabilities of Seller under the Assumed Contracts arising on or after the Closing, including all Determined Cure Costs, and (ii) satisfy and perform all of the Liabilities related to each of the Assumed Contracts described in clause (i) above when the same are due thereunder.

Section 8.4    Confidentiality. Seller agree not to, and shall use commercially reasonable efforts to cause its employees not to, divulge to any Person (other than Buyer or its Affiliates or any persons employed or designated by such entities), directly or indirectly (including through a Subsidiary), publish or make use of any information of any type whatsoever of a confidential nature relating to the Entire Business, the Products or the Acquired Assets, including all types of Intellectual Property, trade secrets, client lists or information, information regarding product development, marketing plans, management organization information, operating policies or manuals, performance results, packaging design or other financial, commercial, business or technical information, except (a) such knowledge or information that is in the public domain through no wrongful act by Seller or any of its employees or Representatives without the prior written consent of Buyer or its Affiliates (as the case may be), (b) for disclosure made pursuant to and in accordance with any Contract to which Seller or any Affiliate of Seller is a party, and (c) as required by applicable law, by an order of a court having competent jurisdiction or under subpoena from an appropriate government agency. This confidentiality provision has no temporal or geographical limitation.

Section 8.5    Acquired Assets "AS IS"; Buyer's Acknowledgment Regarding Same. Buyer agrees, warrants and represents that (a) Buyer is purchasing the Acquired Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on Buyer's own investigation of the Acquired Assets, and (b) except as set forth in this Agreement, neither

Seller nor any Representative of Seller has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Acquired Assets, any part of the Acquired Assets, the financial performance of the Acquired Assets or the Acquired Business, or the physical condition of the Acquired Assets. Buyer further acknowledges that the consideration for the Acquired Assets specified in this Agreement has been agreed upon by Seller and Buyer after good-faith arms'-length negotiation in light of Buyer's agreement to purchase the Acquired Assets "AS IS" and "WITH ALL FAULTS." Buyer agrees, warrants and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that Buyer assumes all risks with respect thereto. EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT, OR INFORMATION MADE, COMMUNICATED, OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION, OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, MANAGER, EMPLOYEE, AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLER OR ANY OF ITS AFFILIATES). SELLER MAKES NO REPRESENTATIONS OR WARRANTIES TO BUYER REGARDING THE PROBABLE SUCCESS, PROFITABILITY OR VALUE OF ANY OF THE ACQUIRED ASSETS.

Section 8.6    Nonsurvival of Representations and Warranties. None of the representations and warranties in any Transaction Document or in any certificate or other instrument delivered pursuant to any Transaction Document shall survive the Closing. The terms of Articles I and II, as well as the covenants and other agreements set forth in Section 7.7, Articles VIII, XI and XII that by their terms apply, or that are to be performed in whole or in part after the Closing shall survive the consummation of the transactions contemplated hereby.

Section 8.7    Post-Closing Access. After the Closing, Buyer and its Affiliates shall use reasonable efforts to provide assistance to Seller with respect to any Claims related to the Entire Business (including the Acquired Business) and to make available to Seller, upon written request and reasonable advance notice:

(a)    (i) such employees who have expertise or knowledge with respect to the Entire Business or matters involved in any such Claims, for the purpose of consultation and/or as a witness; and (ii) its directors, officers, other employees and agents, as witnesses, in each case to the extent that Seller believes any such person may reasonably be useful or required in connection with any such Claim in which Seller may from time to time be involved; *provided, however,* that Seller agree to cooperate with Buyer and its Affiliates in giving consideration to business demands of such persons and Buyer and its Affiliates shall not be obligated to comply with this Section 8.7 to the extent compliance unreasonably interferes with the operation of its business; and

(b)    access to make copies of any of the Acquired Documents.

Buyer shall maintain such Documents and provide the access described above for a period which is the longer of (x) five (5) years, (y) the pendency of any Claim, and (z) the pendency of any tax

audit or investigation by any Governmental Authority commenced during the first five (5) years after the Closing. Seller shall pay for reasonable out-of-pocket expenses actually incurred by Buyer or its Affiliates in connection with this Section 8.7.

Section 8.8    Privacy Policy. After the Closing, to the extent required by applicable Law, Buyer will (and will cause the Acquired Business to) comply with the terms of the Privacy Policy as applicable to personally identifiable information collected by the Acquired Business prior to the Closing.

Section 8.9    DNS Servers. Immediately following the Closing Seller shall take all commercially reasonable action to direct all Acquired Domain Names to the DNS servers identified by Buyer.

Section 8.10    Price Protections. Solely with respect to actions or omissions that may give rise to liabilities, rebates, set-offs or other costs, including charges against Accounts Receivable, in connection with and pursuant to the price protection arrangements relating to Channel Inventory described on Schedule 5.20(b), Buyer shall act in the ordinary and usual course of business consistent with past practice and custom of Buyer. For purposes of clarity, Buyer shall have no right of contribution or collection against Seller with respect to any liabilities, rebates, set-offs or other costs incurred in connection with and pursuant to the price protection arrangements relating to Channel Inventory described on Schedule 5.20(b).

Section 8.11    Music LOIs. In consultation with Buyer, Seller shall, promptly following the date hereof and in any event prior to Closing, file and prosecute any pleadings with the Bankruptcy Court to determine whether any Music LOI is an executory contract (and, if so, the amount of any asserted Cure Cost associated with such Music LOI). If a Music LOI is determined to be an executory contract (an "**Executory Music LOI**") pursuant to a Final Order (an "**Music Order**"), then (a) Buyer shall have no liability for any Cure Cost, Determined Cure Cost or any other liability or cost arising prior to the date of such determination with respect to such Executory Music LOI, (b) Seller shall be liable for and hereby agrees to pay any and all Determined Cure Costs with respect to such Executory Music LOI, pursuant to Section 2.4(t), and (c) Seller shall indemnify Buyer for all claims, liabilities, damages, losses, or expenses (collectively, "Losses") of Buyer incurred between the Closing Date and the date of the Music Order, to the extent (i) arising from or in connection with the delayed assignment (if any) of any Executory Music LOI to Buyer or (ii) that could have been avoided if such Executory Music LOI had been assigned to Buyer at the Closing Date, including, in each case, by way of example, for any claims of infringement of the intellectual property rights of the counterparty to such Executory Music LOI during the period between the Closing Date and the date of the Music Order. Payment on such indemnity shall occur promptly following incurrence of such Loss by wire transfer of immediately available funds from Seller to Buyer, provided, that any payment obligations or amounts owed pursuant to such right of indemnification shall be administrative priority claims pursuant to Section 503(b) of the Bankruptcy Code.

## ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 9.1    Accuracy of Representations. The representations and warranties of Seller contained in Article V shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties that address matters only as of a particular date need only be true and correct as of such date), except to the extent that any inaccuracies or breaches of such representations and warranties have not had, individually or in the aggregate, a Material Adverse Effect. Buyer shall have received a certificate of Seller, signed by a duly authorized officer of Seller, to that effect.

Section 9.2    Seller's Performance. Seller shall have performed and complied with in all material respects the covenants and agreements that Seller is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Buyer shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof.

Section 9.3    No Order. No Governmental Authority shall have enacted, issued, promulgated or entered any Order that is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement (a "**Closing Legal Impediment**").

Section 9.4    Seller's Deliveries. Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

Section 9.5    Sale Order; Final Order. The Bankruptcy Court shall have entered the Sale Order in the form attached as Exhibit 2, or otherwise in form and substance satisfactory to Buyer, in its sole discretion, and the Sale Order shall have become a Final Order and shall not have been stayed by order of any court.

Section 9.6    Assumed Contracts. The Bankruptcy Court shall have approved and authorized the assumption and assignment of the Assumed Contracts.

## ARTICLE X
## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

Seller's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 10.1    Accuracy of Representations. The representations and warranties of Buyer contained in Article VI shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties that address matters only as of a particular date need only be true and correct as of such date). Seller shall have received a certificate of Buyer, signed by a duly authorized officer of Buyer, to that

42

effect.

Section 10.2    Buyer's Performance.  Buyer shall have performed and complied with in all material respects the material covenants and agreements that Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 10.3    Licensor Settlement Agreement.  Licensor and the Debtors shall have entered into a  settlement agreement with respect to all or a portion of Licensor's Claims against the Debtors in form and substance satisfactory to the Debtors, Licensor and the Unsecured Creditor's Committee (the "Licensor Settlement Agreement"), and such Licensor Settlement Agreement shall have been approved by the Bankruptcy Court.

Section 10.4    No Order.  No Closing Legal Impediment shall be in effect.

Section 10.5    Buyer's Deliveries.  Each of the deliveries required to be made to Seller pursuant to Section 4.2 shall have been so delivered.

## ARTICLE XI
## TERMINATION

Section 11.1    Termination Events.  Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date:

(a)    by either Seller or Buyer:

(i)    if a Governmental Authority issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated hereby; *provided, however*, that the right to terminate this Agreement pursuant to this Section 11.1(a)(i) shall not be available to any Party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such ruling or Order;

(ii)    by mutual written consent of Seller and Buyer; or

(iii)    if the Closing shall not have occurred by 11:59 p.m. EST on February 19, 2013 (the "**Outside Date**"); *provided, however*, that (A) Buyer shall be permitted to terminate this Agreement pursuant to this Section 11.1(a)(iii) only if (x) Buyer is not in breach of any of its representations, warranties, covenants or agreements contained herein in such a way that would result in the failure of a condition set forth in Section 10.1 or Section 10.2 to be satisfied and (y) Buyer has provided written notice to Seller of its intention to exercise its rights under this Section 11.1(a)(iii) and Seller has not taken all actions necessary to close the transactions contemplated by this Agreement on or before the date that is five (5) Business Days after the date of such notice from Buyer, and (B) Seller shall be permitted to terminate this Agreement pursuant to this Section 11.1(a)(iii) only if

43

(x) Seller is not itself in breach of any of their representations, warranties, covenants or agreements contained herein in such a way that would result in the failure of a condition set forth in Section 9.1 or Section 9.2 to be satisfied and (y) Seller has provided written notice to Buyer of their intention to exercise their rights under this Section 11.1(a)(iii) and Buyer has not taken all actions necessary to close the transactions contemplated by this Agreement on or before the date that is five (5) Business Days after the date of such notice from Seller; or

(b)    by Buyer:

(i)    in the event of any breach by Seller of any of its agreements, covenants, representations or warranties contained herein (provided such breach would result in the failure of a condition set forth in Section 9.1 or Section 9.2 to be satisfied), and the failure of Seller to cure such breach by the earlier of (A) the Outside Date and (B) the date that is five (5) days after receipt of the Buyer Termination Notice; *provided, however*, that (1) Buyer is not in material breach of any of its representations, warranties, covenants or agreements contained herein or in the Sale Order, (2) Buyer notifies Seller in writing (the "**Buyer Termination Notice**") of its intention to exercise its rights under this Section 11.1(b)(i) as a result of the breach, and (3) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein of which Seller is allegedly in breach;

(ii)    if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

(iii)    the Bankruptcy Court has not approved the Sale Order in form and substance satisfactory to Buyer on or before February 22, 2013;

(iv)    if the Sale Order is vacated or stayed;

(v)    <intentionally omitted>;

(vi)    if Seller withdraws or seeks authority to withdraw the Sale Motion, or announce any stand-alone plan of reorganization or liquidation (or support any such plan filed by any other Party);

(vii)    <intentionally omitted>; or

(viii)    if any conditions to the obligations of Buyer set forth in Article IX shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement; or

(c)    by Seller:  in the event of any material breach by Buyer of any of its agreements, covenants, representations or warranties contained herein (provided such breach would result in the failure of a condition set forth in Section 10.1 or Section 10.2 to be satisfied), and the failure of Buyer to cure such breach by the earlier of (A) the

44

Outside Date and (B) the date that is thirty (30) days after receipt of Seller Termination Notice; *provided, however*, that Seller (1) is not itself in material breach of any of their representations, warranties, covenants or agreements contained herein or in the Sale Order, (2) notify Buyer in writing (the "**Seller Termination Notice**") of their intention to exercise their rights under this Section 11.1(c) as a result of the breach, and (3) specify in such Seller Termination Notice the representation, warranty, covenant or agreement contained herein of which Buyer is allegedly in breach.

Section 11.2    Effect of Termination.

(a)    In the event of a termination of this Agreement pursuant to Section 11.1(c), Buyer shall owe Seller the Fight Team Expenses from January 25, 2013 through the date of such termination; *provided, however,* that except with respect to the fulfillment of Buyer's obligations pursuant to Section 11.2(b), payment of such Fight Team Expenses by Buyer to Seller shall constitute liquidated damages and the sole and exclusive remedy of Seller against Buyer in the event of a termination hereunder and shall limit Seller's remedies against Buyer in any respect of any claim against Buyer arising under this Agreement or otherwise.

(b)    In the event of any termination of this Agreement pursuant to Section 11.1, Buyer shall (i) promptly return, at its own cost and expense, the Interim Deliveries and any other Acquired Assets to Seller (or Seller's designee), (ii) promptly destroy any copies of the Acquired Assets in the possession of Buyer or Buyer's Representatives, and (iii) certify to Seller in writing that Buyer has complied with its obligations pursuant to this Section 11.2(b).

## ARTICLE XII
## GENERAL PROVISIONS

Section 12.1    Public Announcements.  The initial press release relating to this Agreement shall be a joint press release, the text of which shall be agreed to by Buyer and Seller.  Buyer and Seller shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

Section 12.2    Notices.  All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt), (c) received by the addressee, if sent by a delivery service (prepaid, receipt requested) or (d) received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses, representatives (if applicable) and facsimile numbers set forth below (or to such other addresses, representatives and facsimile numbers as a Party may designate by notice to the other Parties):

(a)    If to Seller, then to:

> THQ Inc.
> 29903 Agoura Road
> Agoura Hills, CA  91301
> Attn:  Edward L. Kaufman, EVP, Business and Legal Affairs
> Facsimile:  818.871.7593

with a copy (which shall not constitute notice) to:

> Gibson, Dunn & Crutcher  LLP
> 2029 Century Park E., Suite 4000
> Los Angeles, CA  90067
> Attn:  Jonathan Layne
> Facsimile:  310.552.7053

(b)    If to Buyer:

> Take-Two Interactive Software, Inc.
> 622 Broadway
> New York, NY 10012
> Attn:  Seth Krauss
> Facsimile:  (646) 536-2923

with a copy (which shall not constitute notice) to:

> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, NY 10019
> Attn:  Adam M. Turteltaub
> Facsimile:  (212) 728-9129

Section 12.3    Waiver.  Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.  To the maximum extent permitted by applicable law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

Section 12.4    Entire Agreement; Amendment.  This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents supersede all prior agreements between Buyer and Seller with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer and Seller with respect to their subject matter.  This Agreement may not be amended except by a written

agreement executed by all of the Parties.

Section 12.5    Assignment. This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); *provided*, *however*, that Buyer shall be permitted, upon prior notice to Seller, to assign all or part of its rights or obligations hereunder to any wholly-owned subsidiary of Buyer, to an Affiliate or to any third party that at any time provides debt financing to Buyer or its Affiliates, whether in connection with the transactions contemplated hereby or otherwise, but no such assignment shall relieve Buyer of its obligations under this Agreement, and Seller shall be permitted to assign all or part of their rights or obligations hereunder pursuant to a plan of reorganization or liquidation approved by the Bankruptcy Court.

Section 12.6    Severability. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 12.7    Expenses. Whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby (except as otherwise specified herein).

Section 12.8    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code control, this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such

Proceeding; *provided, however*, that, if the Bankruptcy Case is closed, all Proceedings arising out of or relating to this Agreement shall be heard and determined in a Delaware state court or a federal court sitting in the State of Delaware, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding. The Parties consent to service of process by mail (in accordance with Section 12.2) or any other manner permitted by law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLER OR BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

Section 12.9     Counterparts. This Agreement and any amendment hereto may be executed in one or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall be deemed to constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.2, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

Section 12.10     Parties in Interest; No Third Party Beneficiaries. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

Section 12.11     Non-Recourse. No past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any Party hereto shall have any liability for any obligations or liabilities of the Parties under this Agreement or any other Transaction Document, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby, and each Party hereby covenants, on behalf of itself and its Affiliates, not to sue any past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any other Party for any such claim.

Section 12.12     Schedules; Materiality. The inclusion of any matter in any Schedule shall be deemed to be an inclusion for all purposes of this Agreement, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement. The disclosure of any particular fact or item in any Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 12.13     Specific Performance. The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an

48

adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement.  If any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at law.

Section 12.14    Survival.  All covenants and agreements contained herein that by their terms are to be performed in whole or in part, or that prohibit actions, subsequent to the Closing shall survive the Closing in accordance with their terms.  All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate.

*Signature pages follow.*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

TAKE-TWO INTERACTIVE SOFTWARE, INC.

By: _____

Name: SLATOFF

Title: COO

**THQ INC.**

By: _____

Name: Edward L. Kaufman

Title: EVP, Business & Legal Affairs