**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| THQ, Inc., *et al.*, | Case No. 12-13398 (MFW) |
| Debtors. | Jointly Administered |

**MOTION FOR RECONSIDERATION**

Claimant Christopher Escobedo ("Escobedo") requests that the Court reconsider its ruling in the Order Estimating the Claim Filed by Christopher Escobedo at Zero for All Purposes and Establishing Disputed Interim Distributions Reserve With Respect Thereto. (Doc. 931)(hereinafter the "Order Estimating the Claim").  Pursuant to 11 U.S.C. §502(j) cause exists and the equities of the case warrant reconsideration.  Alternatively, if the Court deems the Order Estimating the Claim to be final, appealable, order, then Escobedo requests that this Motion be treated as a motion for a new trial or to alter or amend a judgment pursuant to Fed. R. Bankr. P. 9023.

Initially, it should be noted that despite the title of the Order Estimating Claim, the Court estimated the claim at $22,500, not zero.  The Court estimated the claim at exactly the amount purportedly paid to Carlos Condit by the UFC (not by THQ) for his appearance in the games.  The Court estimated the claim without first providing Escobedo an opportunity to conduct any discovery to determine the reasonable royalty rates that THQ had paid others for artwork in games.

1

## I. The Relevant Facts

The full recitation of facts is set forth in Escobedo's response to the original motion (Doc. 867), is incorporated by reference, and will not be repeated here except with respect to those facts that directly relate to this request for reconsideration. In addition, the exhibits supporting the facts included herein were filed as attachments to Document 867.

THQI has sold approximately 4.1 million units of these computer games containing the copyright infringement of Mr. Escobedo's original artwork. Condit was the Interim UFC Welterweight Champion until November 17, 2012, making him one of the most popular figures in the Undisputed Games. When Condit's avatar was chosen as the avatar for a game, his character and the Lion Tattoo are visible on the computer screen for over fifteen minutes just in the first level of the game. The Lion Tattoo is usually fully visible, and usually not partially obscured. (See additional still shots from Undisputed 3, Exhibit "A"). That THQ itself considered the tattoo a valuable piece of artwork is demonstrated by the fact that THQ featured Condit and a full view of the tattoo in its official video advertising Undisputed 3.

## II. Legal Argument

### A. The $22,500 is Unrelated to The Agreed Upon Test for Calculating Copyright Infringement Damages

In determining copyright damages, most courts have adopted the "hypothetical license" method as the most reliable and appropriate measure of the loss in fair market value of a copyright. Where, as in this case, "the infringer could have bargained with the copyright owner to purchase the right to use the work, actual damages are what a willing buyer would have been reasonably required to pay a willing seller for the plaintiff's work." *Jarvis v. K2 Inc.*, 486 F.3d 526, 533-34 (9th Cir. 2007), *citing Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir. 1977),

2

*superseded on other grounds by* 17 U.S.C. §504(b); see *Gaylord v. U.S.*, 678 F.3d 1339, 1343 (Fed. Cir. 2012) (same); *On Davis v. The Gap, Inc.*, *supra*, 246 F.3d at 161-62 (same).

THQ's expert agrees that this is the test. In his declaration, Robert Wunderlich states that "In practice, these approaches are commonly applied in the context of considering hypothetical negotiations between the owner of the copyright and the party who wishes to acquire and/or license the copyright."

Despite an agreement between the parties that the appropriate test is a hypothetical negotiation, THQ's expert persisted in his opinion that the hypothetical negotiation between THQ and Escobedo would have yielded the same flat fee that the actual contract between UFC and Condit yielded. THQ's expert ignored the following facts in proffering that opinion:

1. UFC, not THQ, entered into a contract with Condit;

2. The UFC–Condit contract was based on the use of his likeness, not on the license of artwork;

3. UFC was already compensating Condit hundreds of thousands of dollars for fighting;

4. UFC had a history of firing fighters who would not agree to the use of their likeness in computer games.

If Condit believed that he had no choice but to agree to the use of his likeness, a fact that he <u>did not dispute</u> in his declaration in the reply, then the fact that he was paid a $22,500 bonus by UFC for the use of his likeness has no bearing whatsoever on the hypothetical negotiation between THQ and Escobedo.

**B.    Limited Discovery Is Appropriate**

A far superior method for determining what royalty a hypothetical negotiation between Escobedo and THQ would have produced would be to look at what THQ paid for other copyright protected artwork used for a similar amount of time in their video games.

3

Both experts agreed that they did not have all of the facts needed to do a complete analysis. Before the claim was estimated, Escobedo should have been given the opportunity to conduct targeted discovery to determine the terms of the licensing arrangement between THQ and UFC and the terms of THQ's other license agreements that included the license of copyright protected artwork.

The importance of such discovery in a case such as this cannot be understated. *See*, *e.g.*, *Capital Concepts, Inc. v. Mountain Corp.*, ___ F.3d ___, 2013 WL 1319348. 10-11 (W.D.Va. 2013) (copyright infringer's failure to produce information responsive to owner's discovery requests necessary for an accurate calculation of profitability was not justified or harmless and warranted sanction of precluding infringer from introducing any undisclosed evidence concerning its profits at trial).

**C. The Song Licenses are Relevant but not Comprehensive**

As the Court will recall, THQ, in its reply, produced the song licenses from the Undisputed Games. THQ <u>chose</u> to produce those licenses and <u>chose</u> to not produce any other copyright licenses. THQ produced the song licenses, because, by applying a tortured analysis, THQ's expert could extrapolate those figures and argue for a minimal estimation of Escobedo's claim.

Mr. Wunderlich's analysis, however, ignored his own test for calculating damages in opining that using the song licenses as a benchmark would yield a royalty of less than $22,500.

First, the songs in the Undisputed Games are played for only <u>seconds</u>, not minutes and, certainly not fifteen minutes. If Mr. Wunderlich had considered in his calculation the amount of time the copyrighted material appeared on the screen, which even he admits is relevant, his calculation would have yielded damages close to those calculated by Escobedo's expert, Gary Kitchen.

Second, the song license calls for credit. It required THQ to include the song publisher and the song information in the credits of the video. There is significant value in having ones name in the credits of a computer game that has sold 4.1 million copies. Escobedo never received any credit.

Third, Mr. Wunderlich ignored the song royalties from his sources that were computed on a per product basis and looked solely to the one-time buy-out fee per composition formulas.

Finally, Mr. Wunderlich ignored that THQ had literally millions of songs to choose from when deciding what music clips to include in its games. There was no restriction on their choice. Thus, they had the opportunity to choose the least expensive music license they could get. To produce a UFC computer game, however, THQ had a limited number of fighters to choose from and had no choice but to either not include the fighter's tattoo on the avatars or include it. THQ did not have the option of placing any artwork it could license inexpensively on the avatar. That fact alone would have placed Escobedo in a very different bargaining position than the music publisher and makes it likely that Escobedo would have negotiated a per game royalty rather than a one-time fee.

If discovery reveals that THQ paid other artists to license their artwork in the game, those licenses will be very relevant to the hypothetical negotiation between Escobedo and THQ. The equities of the case warrant reconsideration and an Order permitting Escobedo limited relevant discovery before his claim is estimated.

## CONCLUSION

For all of the foregoing reasons, Escobedo respectfully requests that this Court reconsider its Order Estimating the Claim and rule that Escobedo may conduct limited discovery as to the amount that THQ paid to other licensors of copyright protected materials.

///

///

///

16290-1\MCS\DAG\1104499.1

DATED this 31st day of July, 2013.

                                          /s/Maria Crimi Speth
Maria Crimi Speth
David N. Farren
Jeffrey A. Silence
**JABURG & WILK, P.C.**
3200 N. Central Avenue, Suite 2000
Phoenix, AZ  85012
602-248-1000
mcs@jaburgwilk.com
dnf@jaburgwilk.com
jxs@jaburgwilk.com
Attorneys for Claimant
Christopher Escobedo

6